914 A.2d 1250

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. BRIAN W. SAMUELS, DEFENDANT–APPELLANT.

Argued September 26, 2006—Decided January 31, 2007.

238

*James K. Smith, Jr.*, Assistant Deputy Public Defender, argued the cause for appellant (*Yvonne Smiths Segars*, Public Defender, attorney).

*Mary R. Juliano*, Assistant Prosecutor, argued the cause for respondent (*Luis A. Valentin*, Monmouth County Prosecutor, attorney).

*Lora B. Glick*, Deputy Attorney General, argued the cause for amicus curiae, Attorney General of New Jersey (*Anne Milgram*, Acting Attorney General, attorney).

Justice LONG delivered the opinion of the Court.

Pursuant to an indictment returned by a Monmouth County Grand Jury, defendant, Brian Samuels and his co-defendant, Godfred Mainhooh (a.k.a. Rahim), were charged with conspiracy to commit armed robbery, contrary to *N.J.S.A.* 2C:5–2 and *N.J.S.A.* 2C:15–1 (count one); first-degree armed robbery, contrary to *N.J.S.A.* 2C:15–1 (count two); second-degree possession of a firearm for an unlawful purpose, contrary to *N.J.S.A.* 2C:39–4a (count

three); and fourth-degree aggravated assault by pointing a fire-arm contrary to *N.J.S.A.* 2C:12–1b(4) (count four). Defendant also was charged individually with second-degree unlawful possession of a firearm by a convicted felon contrary to *N.J.S.A.* 2C:39–7b (count six), and third-degree resisting arrest, contrary to *N.J.S.A.* 2C:29–2a (count ten).[1] Because Mainhooh had absented himself, defendant was tried alone.

At trial, the testimony elicited on behalf of the State was as follows: On May 4, 2000, the Long Branch Police Department conducted a narcotics investigation in which they attempted to purchase narcotics from an individual named "Rahim." The police first secured two adjacent hotel rooms (room numbers 229 and 230) on the second floor of the Fountains Motel in Long Branch. Officers Pilone and Roebuck were stationed in Room 229. Two backup officers (Magarino and Shea) were stationed in Room 230 and an additional officer, Morey, was positioned on the roof of the motel. In addition, marked and unmarked patrol cars were stationed near the motel complex.

Around ten o'clock that night, Pilone placed a telephone call from Room 229 to Rahim, the subject of the investigation, Pilone identified himself as "Jimmy" and explained that they had met at "Mommas House" on Fourth Avenue in Asbury Park.

Pilone testified:

> I told him I had a dope habit, a heroin habit. I told him I needed two bundles of heroin and the rest of the—we had $1200 to spend. I needed two bundles of heroin, which is 20 decks of heroin, and the rest I wanted in crack cocaine because we were having some type of party and my friends wanted crack cocaine.

Pilone advised Rahim where he could be found and asked him to deliver the drugs. Rahim agreed to provide the drugs within a half-hour. Minutes later, Rahim called the motel switchboard and reached room 229, confirming Pilone's presence there. Pilone told Rahim to "bring [him] good stuff, or good product." Rahim

---

[1] Counts five, seven, eight and nine of the indictment charged only co-defendant Mainhooh.

responded, "Don't worry I'll take care of you" and told Pilone to look for him to arrive in a cab.

None of the officers saw Rahim arrive at the motel. However, at approximately 11:00 p.m., Officer Morey alerted the others that two men were coming up the staircase leading to room 229. They were defendant and co-defendant Mainhooh. As the men walked along the second-floor balcony of the motel, they appeared to be conversing and checking the numbers on the doors of the rooms. Morey did not see either man with a weapon.

Mainhooh knocked on the door of room 229. Pilone looked through the peephole, saw him, and inquired, "Who?" The reply was "Rahim." Pilone alerted the members of his group that they were moving in. Roebuck opened the door, Pilone "cut in front of him" and "rushed out," "yelling police, police, police." He was wearing a t-shirt with a police decal, a badge on a lanyard around his neck, a gun belt, handcuffs, and a police radio. Pilone explained:

I rush out. I'm yelling, police, police, police. I see, as I am entering the doorway, I see Rahim, and off to my right I see Mr. Samuels standing off to the right.

As I am nearing Rahim, my intent was to grab him. I look and I notice that he is, in his right hand he is holding what I believe to be [9] mm pistol, automatic weapon.

. . . .

At the time it was [pointed] at my chest, and I was already committed. I was already moving forward. There is nothing I could do. If I stopped, backed up, he would have time to shoot me.

I kind of ducked a little bit. I knocked his hand up and I pushed him back against the railing.

. . . .

He was aiming like this. As I am coming out yelling police, he had this look of surprise on his face. He started backing up. As he is backing up, the gun is coming up from my chest up towards my face. That's when I kind of leaned over, ducked down, whatever I did.

. . . .

Pilone quickly pinned Mainhooh against the railing. At that point, defendant grabbed Pilone and struggled with him, allowing Mainhooh to flee. Pilone pulled defendant into room 229 where

they fell to the floor and wrestled for approximately a minute and a half before defendant was placed in handcuffs. After defendant was secured, Pilone stated to him that he knew that defendant and Mainhooh were there to sell drugs. Defendant replied, *"[w]e don't have any drugs; we don't have any drugs."* (emphasis added).

While Pilone struggled with and arrested defendant, Roebuck chased Mainhooh. Magarino and Shea blocked the stairway, forcing Mainhooh to the end of the balcony, where he was cornered. Mainhooh hesitated "for a second, and then . . . jumped over the balcony just as Officer Shea grabbed his sweatshirt." He got up and fled through the back parking lot of the motel.

Roebuck, Shea and Magarino ran down the stairs in pursuit of Mainhooh. Roebuck saw Mainhooh throw something in the parking lot and heard a "metallic clatter like something heavy metal hitting the pavement." Roebuck and the others later apprehended Mainhooh in the woods. After the arrest, Roebuck found a loaded and cocked nine-millimeter semi-automatic Astra handgun in the parking lot where he had heard the metal object hit the pavement. No drugs were found.

Although Pilone had testified, without objection, that he told defendant that he knew defendant was there to sell drugs, at trial Pilone stated that "[t]hey weren't there to sell me narcotics; they were there to rob me." Pilone admitted however that he neither reported the crime as a robbery nor discussed robbery in his testimony before the grand jury.

Pilone also testified that he had been involved in "hundreds" of narcotics arrests and had special training in narcotics. He explained that "[t]here [are] no certainties in narcotics. You could order drugs; they may bring your drugs or they may try to rob you, to try to get the money from you." He also admitted the "possibility" of drug dealers themselves being robbed.

Defendant, who testified at trial, gave a much different account of the events of May 4, 2000. According to him, he ran into

Mainhooh around 10:30 p.m. outside a liquor store in Asbury Park. Although not friends, defendant and Mainhooh "knew each other from the block." Mainhooh told defendant that he needed to "take a ride" with him. Defendant testified that he never asked what he and Mainhooh were going to do and that for "all [he knew], Mainhooh was going to see a houseful of girls." When they caught a cab, defendant learned that they were taking a round-trip ride to Long Branch, several towns away. Defendant testified that he fell asleep in the cab and awoke when they arrived at the Fountains Motel. Upon arrival, defendant walked around the motel with Mainhooh, eventually reaching Room 229. After hearing the "who" and "Rahim" exchange that occurred between Mainhooh and Pilone, defendant, who was standing near Mainhooh, saw three men come out of the motel room. Defendant, who acknowledged that he had a crackpipe in his possession, denied that Mainhooh had a gun in his hand and also denied having jumped on Pilone or engaged in a scuffle.

Defendant was convicted of conspiring with Mainhooh to commit armed robbery, armed robbery, possession of a firearm for an unlawful purpose, aggravated assault, and resisting arrest. The charge of possession of a firearm by a convicted felon was dismissed. The trial judge sentenced defendant to an aggregate custodial term of fifty years with seventeen years of parole ineligibility.

Defendant appealed, claiming among other things, that there was inadequate evidence to support the conspiracy and armed robbery counts; that the trial judge should have charged the jury with the lesser included offense of attempted robbery; and that the jury instructions were incorrect and so confusing as to have led the jury into error. The Appellate Division affirmed with respect to those issues,[2] and defendant filed a petition for certifica-

---

[2] The Appellate Division reversed defendant's convictions for possession of a firearm for an unlawful purpose, *N.J.S.A.* 2C:39-4a, and resisting arrest, *N.J.S.A.*

tion. We granted that petition, *State v. Samuels,* 186 *N.J.* 244, 892 *A.*2d 1291 (2006), and the Attorney General of New Jersey's request for leave to appear *amicus curiae.*

## II.

Defendant argues that the conspiracy and armed robbery counts should have been dismissed or a judgment of acquittal granted because the evidence fell short of what was necessary to sustain those convictions; that an attempted robbery charge was clearly indicated by defendant's testimony that Mainhooh did not display a gun; and that the incorrect and confusing instructions on conspiracy and accomplice liability misled the jury.

The State counters that, with all favorable inferences, the circumstantial evidence in the case warranted the convictions for conspiracy and robbery, and that any errors in the jury instruction were harmless. The Attorney General's arguments generally mirror those of the State except that the Attorney General also argues that the attempted robbery charge was not clearly indicated by the evidence.

## III.

We turn first to the adequacy of the evidence and defendant's contention that his motions for dismissal and for judgment of acquittal on the conspiracy count should have been granted.

■ When examining a motion for judgment of acquittal at the close of the state's case, a court must determine

> whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt.
>
> [*State v. Reyes,* 50 *N.J.* 454, 458–59, 236 *A.*2d 385 (1967).]

2C:29–2a, because the trial judge failed to instruct the jury on the essential elements of those charges. Those issues are not before us.

The same standard is applicable to a motion for dismissal filed at the close of all the evidence. *R.* 3:18–1; *State v. Morrison,* 188 *N.J.* 2, 13, 902 *A.*2d 860 (2006). In reviewing such motions, a court "may not consider any evidence adduced by the defense in determining if the State had met its burden as to all elements of the crime charged." Pressler, *Current N.J. Court Rules,* comment 1 on *R.* 3:18 (2006). We therefore confine our analysis of the adequacy of the evidence to the State's case and the inferences to be derived therefrom.

 *N.J.S.A.* 2C:5–2 provides:

a. A person is guilty of conspiracy with another person or persons to commit a crime if with the purpose of promoting or facilitating its commission he:

(1) *Agrees* with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) *Agrees* to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

[(emphasis added).]

As the language of the statute reveals, the agreement to commit a specific crime is at the heart of a conspiracy charge. Such an agreement is central to the purposes underlying the criminalization of the inchoate offense of conspiracy. Thus, under the Code " 'the major basis of conspiratorial liability [is] the unequivocal evidence of a firm purpose to commit a crime' " that is provided by the agreement.[3] *State v. Roldan,* 314 *N.J.Super.* 173, 181, 714 *A.*2d 351 (App.Div.1998) (quoting Model Penal Code § 5.03 comment 2 (Tentative Draft No. 10 (1960)). " 'The agreement is an advancement of the intention' " to commit the crime. *State v. Abrams,* 256 *N.J.Super.* 390, 401, 607 *A.*2d 179 (App.Div.1992) (quoting *State v. Carbone,* 10 *N.J.* 329, 336–37, 91 *A.*2d 571 (1952)), *certif. denied,* 130 *N.J.* 395, 614 *A.*2d 617 (1992). Actual commis-

---

[3] *N.J.S.A.* 2C:5–2 requires that in addition to an agreement, an overt act must be committed for a conspiracy conviction to stand. There is no dispute over this element in the instant case. If it can be established that defendant agreed with Mainhooh to commit robbery, numerous actions by both men could constitute the necessary "overt act."

sion of the crime is not a prerequisite to conspirator liability. Intervention is permitted to prevent completion of a planned crime and facilitating prosecutions that strike "against the special dangers of group criminal activity." *State v. Hardison,* 99 *N.J.* 379, 385, 492 *A.*2d 1009 (1985). It is the agreement that is pivotal. *Id.* (quoting *Carbone, supra,* 10 *N.J.* at 336, 91 *A.*2d 571).

██ Because the conduct and words of co-conspirators is generally shrouded in "silence, furtiveness and secrecy," the conspiracy may be proven circumstantially. *State v. Phelps,* 96 *N.J.* 500, 509, 476 *A.*2d 1199 (1984) (quoting Note, *The Coconspirator's Exception to the Hearsay Rule: Bootstrapping in the New Procedure from the First Circuit,* 50 *U. Colo. L.Rev.* 93, 103–04 (1978)); *Carbone, supra,* 10 *N.J.* at 341, 91 *A.*2d 571; *see also State v. Kamienski,* 254 *N.J.Super.* 75, 94, 603 *A.*2d 78 (App.Div.1992) (stating that "[a]n implicit or tacit agreement may be inferred from the facts and circumstances").

██ Circumstantial evidence is to be tested

by the rules of ordinary reasoning such as govern mankind in the ordinary affairs of life. While certain actions of each of the defendants, when separated from the main circumstances and the rest of the case, may appear innocent, that is not significant and undoubtedly appears in every case of criminal conspiracy.

[*State v. Graziani,* 60 *N.J.Super.* 1, 13–14, 158 *A.*2d 375 (App.Div.1959).]

"[T]here are no legal rules as to what inferences may be drawn. The question is one of logic and common sense." *State v. Powell,* 84 *N.J.* 305, 314, 419 *A.*2d 406 (1980). When "each of the interconnected inferences [necessary to support a finding of guilt beyond a reasonable doubt] is reasonable on the evidence as a whole," judgment of acquittal is not warranted. *United States v. Brodie,* 403 *F.*3d 123, 158 (3d Cir.2005); *United States v. Applewhaite,* 195 *F.*3d 679, 684 (3d Cir.1999) (describing necessary connection between evidence and inferences as "logical and convincing").

The essential elements of the State's conspiracy case must be understood with reference to its alleged criminal object. Here, that object was armed robbery. *N.J.S.A.* 2C:15–1 defines armed robbery as follows:

a. A person is guilty of robbery if, in the course of committing a theft, he:

(1) Inflicts bodily injury or uses force upon another; or

(2) Threatens another with or purposely puts him in fear of immediate bodily injury; or

(3) Commits or threatens immediately to commit any crime of the first or second degree.

An act shall be deemed to be included in the phrase "in the course of committing a theft" if it occurs in an attempt to commit theft or in immediate flight after the attempt or commission.

b. Robbery is a crime of ... the first degree if in the course of committing the theft the actor ... is armed with, or uses or threatens the immediate use of a deadly weapon.

Accordingly, the State was required to prove that defendant, with the purpose (*i.e.*, conscious object) of promoting or facilitating an armed robbery made an agreement with Mainhooh that included the following terms: (1) one or both of the men would take the drug money from the buyer and keep it; (2) during that endeavor one or both would threaten the buyer with or put him in fear of immediate bodily injury; and (3) one or both of them would be armed with, use or threaten the immediate use of a deadly weapon. *See N.J.S.A.* 2C:15–1; *N.J.S.A.* 2C:5–2; *N.J.S.A.* 2C:2–2.

There is no direct evidence that defendant and Mainhooh agreed to commit robbery: no one overheard them planning or discussing the matter, and neither defendant nor Mainhooh admitted to such an agreement. Thus, defendant's conspiracy conviction can only stand if an agreement reasonably can be discerned from the circumstantial evidence.

The Appellate Division concluded that the State's evidence, with all favorable inferences, was sufficient to carry the conspiracy charge to the jury. In ruling, the panel explained its view of the State's case, and we set forth its reasoning fully below:

We conclude that the testimony of Pilone and Roebuck and defendant's post-arrest statement, if believed, were adequate to permit a reasonable juror to find the essential agreement beyond a reasonable doubt. Mainhooh promised to deliver $1200 worth of drugs, but, after making a phone call to confirm the buyer's location, he appeared at the designated site for delivery without the goods and with a gun and a companion, defendant. He expected the buyer to have $1200 to pay for the drugs.

After defendant and Mainhooh examined the numbers on the motel room doors and found the correct room, Mainhooh took out and readied his gun before knocking, a fact which is reasonably inferred from the brief interval between Mainhooh's knock on the door and his pointing of the gun at Pilone's chest. If Mainhooh had drugs, his readying of the gun might be viewed as consistent with fear of the purchaser, but, without any drugs, the conduct was evidential of a plan to use it to take the buyer's money. One would not expect a buyer to surrender money for no reason, and a gun would give the buyer a reason to hand over his cash.

A reasonable juror could conclude that defendant was not only aware of Mainhooh's plan but also that he would not have been there unless he had agreed to help Mainhooh execute this plan to take the buyer's money at gun point in order to (i.e. with purpose to) accomplish that goal. Mainhooh's phone call to the motel room to confirm the buyer's presence demonstrated his cautious approach to this deal. From Mainhooh's caution and planning, also evidenced by his having the gun ready when Pilone rushed from the room, one could reasonably infer that he had chosen an assistant, not a dupe, to accompany him. *See Brodie, supra,* 403 *F*.3d at 151 (considering evidence of the nature of the relationships between businessmen, and the defendant's hands-on management style in evaluating adequacy of the evidence of a conspiratorial agreement). Just as jurors are free to consider that bank robbers do not expect "clear sailing" and plan accordingly, [*United States v.*] *Spinney, supra,* 65 *F*.3d [231] at 237 [1st Cir., 1995], these jurors were free to consider that Mainhooh did not expect his buyer to willingly part with his drug money and had an alternate plan for persuasion.

Defendant's conduct and post-arrest statement provide additional evidence of his agreement and purpose to aid Mainhooh in taking the buyer's money at gunpoint. It is unlikely that defendant, or anyone else, would go to a motel room in a community near his home at eleven o'clock at night without a clear understanding of the purpose of the trip. This was not a visit to a friend, a quick run to the store or a late-night stop for something to eat. By helping in the search for the correct room, defendant demonstrated that he knew where he and Mainhooh were going.

Upon arrival at the room designated for the drug deal, defendant stood at Mainhooh's side while he handled the gun; that is where defendant was when Pilone rushed from the room and saw the gun pointed at his chest. Defendant's reaction to Pilone's rush against Mainhooh was swift and effective. That response is indicative of readiness to provide promised assistance and not consistent with surprise at the sudden need to come to the aid of one's companion.

Defendant himself gave additional and persuasive evidence of the "team" nature of this enterprise. When arrested, defendant not only professed knowledge of Mainhooh's conduct but linked his own conduct with Mainhooh's by asserting, "We don't have any drugs, we don't have any drugs." The accuracy of defendant's knowledge about Mainhooh's possessions was confirmed by the officers' inability to locate drugs.

The evidence in its entirety and reasonable inferences therefrom were adequate to warrant submission of the charge that defendant, with the purpose of facilitating Mainhooh's goal of taking an unsuspecting buyer's drug money at gunpoint, made

an agreement with Mainhooh to provide assistance during the endeavor. Certainly, the jurors could have reached a different conclusion. But neither our view of the evidence nor the fact that it does not exclude every conceivable hypothesis except guilt is fatal to the State's case. [*State v.*] *Brown, supra,* 80 *N.J.* [587] at 599, 404 *A.*2d 1111. The only question is whether any reasonable juror could find guilt beyond a reasonable doubt, and we conclude that a reasonable juror could have so found. *Ibid.*

We are in accord with that analysis. In our view, a juror could conclude beyond a reasonable doubt that the actions of Mainhooh and defendant, from stem to stern, evidenced an agreement to rob Pilone. Contrary to defendant's contentions, this case is not one in which a jury was permitted to infer agreement from mere presence at the scene of a crime. See *State v. Madden,* 61 *N.J.* 377, 395, 294 *A.*2d 609 (1972) (conspiracy not supported by evidence that crowd formed spontaneously in response to violent incident resulting in killing by two individuals). Nor is it one in which the conspiracy is supported by "mere association," which is clearly "inadequate." *Abrams, supra,* 256 *N.J.Super.* at 401, 607 *A.*2d 179 (quoting *Carbone, supra,* 10 *N.J.* at 336–37, 91 *A.*2d 571). To be sure, defendant was present at the scene in association with Mainhooh. But on this record, much more occurred, including the hour long cab ride late at night, the room number search, the drawn gun, defendant's efforts to help Mainhooh escape, and defendant's declaration that he knew that neither he nor Mainhooh had drugs. We conclude, as did the Appellate Division, that the State's evidence, with all interconnected favorable inferences, was sufficient to warrant submission of the conspiracy charge for consideration by the jury. *Brodie, supra,* 403 *F.*3d at 158.

No doubt the jurors could have reached a different conclusion. But the fact that the evidence does not exclude every conceivable hypothesis except guilt is of no consequence to this analysis. *Brown, supra,* 80 *N.J.* at 599, 404 *A.*2d 1111. The only issue is whether a jury could find beyond a reasonable doubt that defendant and Mainhooh agreed to commit robbery. We have concluded that it could, and affirm the judgment of the Appellate Division

on that point for the reasons expressed by that court and detailed above.[4]

## IV.

The trial judge instructed the jury regarding armed robbery, but did not include an attempted robbery charge. Although not requested by defendant at trial, he now argues that the evidence clearly required the judge to give such a charge, sua sponte.

*N.J.S.A.* 2C:5-1 states that

a. A person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for the commission of the crime, he:

. . . .

(3) Purposely does or omits to do anything which . . . is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

b. Conduct which may be substantial step under subsection a.(3). Conduct shall not be held to constitute a substantial step under subsection a.(3) of this section unless it is strongly corroborative of the actor's criminal purpose.

Attempted robbery occurs where the actor intends a theft but is interrupted before he actually harms anyone or even threatens harm. *State v. Farrad,* 164 *N.J.* 247, 267, 753 *A.*2d 648 (2000).

If, for example, the defendant is apprehended before he reaches his robbery victim and thus before he has actually engaged in threatening conduct, proof of his purpose to engage in such conduct will justify a conviction of attempted robbery if the standards . . . [of attempt] are met.

---

[4] Defendant also argues that there could be no conviction for armed robbery because there was no attempted theft. He claims: "[n]either defendant nor Mainhooh demanded money or attempted to take money from the police officers." Much of what the Appellate Division said in connection with the conspiracy count equally is applicable to armed robbery. Suffice it to say that, according to the State's evidence, Mainhooh discussed a drug deal with the buyer; ascertained that the buyer would be in possession of a large amount of cash; arrived at the site of the proposed deal without drugs; and brandished a weapon before the suspected buyer had even opened the door. Coupled with defendant's acknowledgement that they had no drugs, those facts give rise to a reasonable inference that Mainhooh and defendant were not effectuating a drug deal but were in the process of attempting a theft when they were interrupted.

[*Id.* at 260, 753 A.2d 648 (quoting *Model Penal Code & Commentaries, Part II*, § 222.1 at 114–15).]

The facts in *Farrad* are emblematic of those principles. There, police observed the defendant, who was pacing about outside of a restaurant, cover his face with a scarf. Defendant then entered the restaurant and approached the counter, placing his hand in his coat pocket. The police immediately apprehended defendant and found a loaded revolver in his pocket. We held that those facts were sufficient to sustain an attempted robbery conviction.

Defendant argues that the attempt charge was clearly indicated here because there was evidence that Mainhooh was not actually brandishing the gun during the incident. In support, defendant notes that he testified that Mainhooh did not have a gun in his hand. Relying on *Farrad,* defendant's theory apparently is that if the jury believed his version of the facts, it could conclude that Mainhooh was interrupted before he had a chance to pull the gun and engage in threatening conduct, thus merely attempting a robbery.

The Attorney General counters that contention with the State's version of the facts. In particular, the Attorney General points to Pilone's testimony that Mainhooh wielded a gun and Roebuck's testimony about finding the gun that Mainhooh discarded. Because under that version, Mainhooh "actually threatened" Pilone, the attorney general concludes that this was not an attempt case.

The problem with the Attorney General's response is that it depends on an assessment of the credibility of the witnesses. But credibility is not in issue when determining if a lesser included offense instruction should be given. *See State v. Jenkins,* 178 *N.J.* 347, 361, 840 A.2d 242 (2004) (stating that trial court has independent obligation to instruct on lesser-included charges when facts indicate that jury *could* convict on lesser charge) (quoting *State v. Garron,* 177 *N.J.* 147, 180, 827 A.2d 243, *cert. denied,* 540 *U.S.* 1160, 124 *S.Ct.* 1169, 157 *L.Ed.*2d 1204 (2004)). The question at that stage of the proceedings centers on the existence of evidence to support the lesser included offense, and not on its worth. Here

there was testimony by defendant that Mainhooh did not brandish a gun during the interaction on the motel balcony and did not cause actual harm or even threaten harm before the police intervened. That evidence, if believed by the jury, could have sustained a conviction for attempted robbery. Thus, it was error for the judge to have failed to charge attempted robbery, and defendant is entitled to a new trial on the robbery count at which the lesser charge should be placed before the jury.

## V.

We turn finally to the trial judge's instruction on vicarious liability, which defendant argues was incorrect and hopelessly confusing, notions with which we are in agreement. Obviously, vicarious liability was a critical part of the State's case insofar as there was no direct evidence that defendant actually possessed a firearm or threatened Pilone. Thus to convict him, the State had to prove that he was liable for the conduct of Mainhooh.

The statutory provision relevant to vicarious liability is *N.J.S.A.* 2C:2–6, which provides in relevant part that:

a. A person is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is legally accountable, or both.

b. A person is legally accountable for the conduct of another person when: ...

(3) He is an accomplice of such other person in the commission of an offense; or

(4) He is engaged in a conspiracy with such other person.

c. A person is an accomplice of another person in the commission of an offense if:

(1) With the purpose of promoting or facilitating the commission of the offense; he

(a) Solicits such other person to commit it;

(b) Aids or agrees or attempts to aid such other person in planning or committing it; ...

With those principles in mind, the trial judge first correctly instructed the jury on the elements of the crime of conspiracy under *N.J.S.A.* 2C:5–2. The essence of conspiracy is the agreement to commit a crime that makes a conspirator responsible for the foreseeable acts of another.

The judge then went on:

I told you purposely to stop here because now we are going to go beyond the separate conspiracy crime that I have described. Now we are going to go into other theories about how this Defendant could be responsible for Rahim's conduct. *It is again called conspiracy,* but it deals with vicarious responsibility for the conduct of another.

You are not dealing now with the conspiracy as we defined that separate crime. *We are now dealing with the possibility of a different type of conspiracy, an aiding or abetting or an accomplice to Rahim during the commission of the armed robbery,* or the potential just the theft, not to minimize that. So, we stop.

*You have to determine whether a pre-agreement conspiracy separately has been established beyond reasonable doubt.* If not, okay, is he responsible for the conduct of Rahim under the circumstances which I am about to explain to you *with a whole different concept of what a conspiracy is?*

*Now we are talking, really, conspiracy by being an aider or abettor or an accomplice to another.*

More specifically, the State alleges that the crime of armed robbery, and I am telling you, lesser includeds are potential for your consideration, was committed by Rahim, and *that Defendant is legally accountable for the crime of Rahim because they conspired together to commit that crime during its commission as opposed to that other conspiracy we are finished talking about.*

. . . .

A person is legally accountable for the conduct of another person when he is engaged in a conspiracy with such other person and the conduct is within the scope of the conspiracy.

*Thus, you must decide whether the Defendant engaged in a conspiracy with Rahim to commit the crime of first, armed robbery, the lesser included robbery, the lesser included theft, or he didn't aid or abet at all.*

A person is guilty of a conspiracy with another person during the commission of the crime if, with purpose—again, you see with purpose again—of promoting or facilitating the commission of the crime he agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes the crime, or an attempt or solicitation to commit the crime, or agrees to aid such other person or persons in the planning or commission of such crime, or of an attempt or solicitation to commit the crime. *The same language as that conspiracy we are talking about. Only now we are shifting our focus as to whether he aided and abetted during the commission of the crime or he didn't know what Rahim was going to do at all and he couldn't have aided or abetted.*

*So, we flipped from the prior agreement to now what he did during the alleged commission of the crimes by Rahim. Same concepts.*
[(emphasis added).]

That charge was plainly incorrect insofar as it recognized "two types of conspiracies": one before and one during the crime. However, because defendant did not object, the issue is one of plain error. *See R.* 2:10–2; *State v. Cooper,* 151 *N.J.* 326, 385, 700

A.2d 306 (1997); *State v. Copling*, 326 *N.J.Super.* 417, 428, 741 A.2d 624 (App.Div.1999) (defining plain error as error capable of producing an unjust result). The State contends that defendant cannot meet that exacting standard because the charge overall was correct. That is not so. Not only did the jury instruction create two kinds of conspiracies when there is only one but, in doing so, it obliterated the distinction between the crime of conspiracy and accomplice liability.

To be sure, *N.J.S.A.* 2C:2–6 recognizes both conspiracy and accomplice liability as principles by which a person may be held legally accountable for the conduct of another. Although there is "a great deal of similarity between accomplice and conspirator liability and frequently liability may be found under both theories" the concepts are not identical. Cannel, *New Jersey Criminal Code Annotated,* comment to *N.J.S.* 2C:2–6c (2006) (quoting *State v. McKiver,* 199 *N.J.Super.* 542, 549, 489 A.2d 1256 (App.Div. 1985)). The critical difference is that, as statutorily defined, conspiracy requires proof of an agreement to commit a crime whereas accomplice liability does not. *Id.; compare N.J.S.A* 2C:5–2a (conspiracy defined), *with, N.J.S.A.* 2C:2–6c (accomplice liability defined). Thus, the terms "conspiracy" and "accomplice liability" are not interchangeable. It is in that respect that the charge went wide of the mark. The judge told the jury that even if it did not find an agreement between defendant and Mainhooh to commit a robbery, defendant could still be guilty of "conspiracy" if he aided or abetted Mainhooh during the robbery or otherwise acted as an accomplice. Indeed, the judge stated repeatedly that conspiracy and accomplice liability are the "same concepts" and that defendant could be guilty of conspiracy "by being an aider or abettor or an accomplice" to Rahim. Those instructions were error as a matter of law.

Although conceding those errors, the State counters that because the jury in fact found defendant guilty of the crime of conspiracy, it followed under *N.J.S.A.* 2C:2–6(b)(4) that defendant was vicariously liable for the foreseeable acts of Mainhooh and

thus any error in the vicarious liability aspect of the charge had to be harmless. Again, we disagree.

As we have said, the judge misstated the elements of conspiracy. That instruction preceded the return of any verdict in the case. At the time that it was determining whether defendant was guilty of the crime of conspiracy, the jury had before it a wrong definition of the crime, leaving open the possibility that defendant could be found guilty without the requisite agreement having been established beyond a reasonable doubt. As a result, there is no assurance that the jurors understood and applied the correct legal principles in reaching their verdict on the conspiracy count. We therefore must reverse that conviction and remand the case for retrial.

## VI.

The judgment of the Appellate Division affirming defendant's convictions for conspiracy and armed robbery is reversed. The conspiracy and armed robbery counts are remanded for retrial in accordance with the principles to which we have adverted.

Justice ALBIN, dissenting.

In the record before this Court, there was more than enough evidence to charge and convict defendant of conspiracy to distribute heroin and crack cocaine, even though drugs were not found on defendant or his co-defendant, Godfred Mainhooh. The State, however, did not charge defendant with committing a drug offense. I cannot agree with the majority that the State presented sufficient evidence from which a jury could conclude beyond a reasonable doubt that defendant committed an armed robbery, a conspiracy to commit an armed robbery, or an attempted robbery as a lesser-included offense. Indeed, there was a complete absence of such evidence, and therefore the robbery charges should not have been submitted for the jury's consideration. Defendant was entitled to a judgment of acquittal on the armed robbery and conspiracy charges, and consequently the retrial ordered by the

majority violates double jeopardy principles. *See Burks v. United States,* 437 *U.S.* 1, 18, 98 *S.Ct.* 2141, 2150–51, 57 *L.Ed.*2d 1, 14 (1978); *State v. Tropea,* 78 *N.J.* 309, 314, 394 *A.*2d 355 (1978). For that reason, I respectfully dissent.

The majority's conclusion is based on facts presented at trial concerning a narcotics investigation conducted by the Long Branch Police Department. In the course of that investigation, an undercover police officer operating out of a motel room placed a telephone call to Mainhooh for the purpose of purchasing drugs. Mainhooh agreed to sell the undercover officer twenty decks of heroin and some crack cocaine for $1200. Mainhooh arrived with defendant at the motel in a taxi cab. The police surveillance team did not see Mainhooh and defendant arrive at the motel. Some time after their arrival, Mainhooh and defendant proceeded to the second floor of the motel where the undercover officer's room was located.

After Mainhooh knocked on the correct motel room door and announced his presence, two police officers—not in uniform—came flying out of the room. The officers found Mainhooh brandishing a gun. Mainhooh never said, "Give me the money," or uttered any other words that would have suggested that he intended to commit a robbery rather than engage in a drug transaction. Defendant grabbed one of the officers, allowing Mainhooh to flee. Defendant was subdued by an officer, who said that he knew defendant was there to sell drugs. Defendant responded, "We don't have any drugs; we don't have any drugs." No drugs were discovered on defendant or his co-defendant, who was arrested shortly afterwards.

The success of a drug prosecution does not depend on whether controlled dangerous substances are found on a defendant. Experience teaches us that drug dealers act surreptitiously both to avoid detection and to protect themselves from getting "ripped off" from the buyer. Thus, many drug dealers when engaging in transactions do not carry the narcotics on their persons, but rather stash the drugs elsewhere for later retrieval. *See, e.g.,*

*State v. Lewis*, 185 *N.J.* 363, 365–66, 886 *A.*2d 643 (2005) (noting that after conversing with buyer, defendant walked to nearby location, retrieved bag from under log, removed items from bag, and returned to buyer); *State v. Arthur*, 184 *N.J.* 307, 314, 877 *A.*2d 1183 (2005) (describing testimony of officer who observed seller, after speaking with buyer, retrieve drugs from bushes and return to buyer who handed money in exchange for drugs); *State v. Brana*, 127 *N.J.* 64, 66, 601 *A.*2d 1160 (1992) (explaining that undercover officers arranged to meet co-defendant to purchase drugs; co-defendant joined officers in car, directed them to location where transaction was to take place, and instructed officers to park; co-defendant walked to nearby car and retrieved narcotics from defendant); *State v. Corso*, 355 *N.J.Super.* 518, 523, 810 *A.*2d 1130 (2002) (noting detective's testimony that although defendant had no drugs on his person, it is common to keep drugs in another location).

Defendant's statement to the police, "We don't have any drugs," accurately reflected that no drugs would be found either on him or his co-defendant. It would have been entirely consistent with the undercover officer's prior conversation with Mainhooh and the custom of drug dealers in general that Mainhooh or defendant deposited the drugs in a safe location before finalizing the deal.

Nor is it unusual for drug dealers, who are fearful of having their money or drugs stolen, to carry guns during a drug transaction in order to protect themselves from the buyers. *See State v. Spivey*, 179 *N.J.* 229, 240, 844 *A.*2d 512 (2004) (noting that narcotics expert testified that drug dealers often carry guns for protection). In fact, because guns and drugs can be a lethal combination, possessing a firearm in the course of committing a drug offense is a second degree crime. *N.J.S.A.* 2C:39–4.1a.

"A prerequisite for a robbery conviction is a theft or attempted theft." *State v. Farrad*, 164 *N.J.* 247, 257, 753 *A.*2d 648 (2000); *see N.J.S.A.* 2C:15–1a. Possibly, defendant and Mainhooh were conspiring to commit a robbery. We do not, however, permit a jury to convict based on possibilities. What the majority has

deemed to be a "reasonable inference" that defendant was engaged in a conspiracy to commit robbery is merely nothing more than speculation. *See ante* at 250 n. 4, 914 *A.*2d at 1258 n. 4.

Had Mainhooh uttered words or made gestures that revealed that he had an intent to rob, I would have come to a different conclusion. The record provides no basis from which a jury could reasonably infer that Mainhooh brandished the gun "in the course of committing a theft" or "in an attempt to commit theft," *N.J.S.A.* 2C:15–1a, and therefore a judgment of acquittal should have been entered. Because the majority will permit a retrial of the robbery and conspiracy charges, I must respectfully dissent.

Justice WALLACE joins in this opinion.

*For reversal and remandment*—Justices LONG, LaVECCHIA, ZAZZALI and RIVERA–SOTO—5.

*Dissenting*—Justices ALBIN and WALLACE—2.