<div style="border:1px solid">

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

</div>

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5872-17T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JEMALL D. BROWN,

    Defendant-Appellant.

_____

Submitted May 26, 2020 – Decided July 16, 2020

Before Judges Sabatino and Sumners.

On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Indictment No. 17-03-0319.

Joseph E. Krakora, Public Defender, attorney for appellant (Daniel Vincent Gautieri, Assistant Deputy Public Defender, of counsel and on the brief).

Scott A. Coffina, Burlington County Prosecutor, attorney for respondent (Nicole Handy, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

A New Jersey State Trooper pulled over a vehicle driven by defendant Jemall D. Brown for speeding on the New Jersey Turnpike. When the trooper asked for defendant's credentials, he maintained he smelled burnt marijuana emanating from the vehicle and requested consent to search the vehicle, which defendant purportedly granted. The search led to the seizure of eighty-eight credit cards and gift cards located in various places within the vehicle, and the arrest of defendant and two passengers in the vehicle.

Following defendant's indictment, defendant's motion to suppress the seized evidence claiming the search was unconstitutional, was denied. In the subsequent trial, a jury found defendant guilty of conspiracy to engage in the fraudulent use of credit cards, N.J.S.A. 2C:5-2(a)(l) and 2C:21-6(h). Defendant was found not guilty of eighty-eight counts of knowingly using any counterfeit, altered or fraudulently obtained credit cards, N.J.S.A. 2C:21-6(h), and one count of intent to defraud a purported issuer or organization providing something of value by using a falsely made or embossed credit card, N.J.S.A. 2C:21-6(c)(5).

Before us, defendant argues:

> POINT I
>
> THE TRIAL COURT ERRED IN DENYING
> [DEFENDANT'S] MOTION TO SUPPRESS
> EVIDENCE BECAUSE THE STATE FAILED TO
> PROVE THAT BROWN UNEQUIVOCALLY

2

CONSENTED TO THE SEARCH AND BECAUSE HE WAS DEPRIVED OF AN OPPORTUNITY TO EXERCISE HIS RIGHT TO TERMINATE THE SEARCH.

POINT II

THE TRIAL COURT ERRED IN DENYING [DEFENDANT'S] MOTION FOR A JUDGMENT OF ACQUITTAL ON THE CONSPIRACY CHARGE BECAUSE NO PROOFS WERE PRESENTED THAT THE OCCUPANTS OF A RENTED CAR HAD CONSPIRED TO USE FRAUDULENT CREDIT CARDS THAT WERE ALMOST ENTIRELY IN THE POSSESSION OF THE FRONT-SEAT PASSENGER.

Having considered the record before us and the applicable law, we affirm in part and reverse and remand in part.

I.

A. Suppression Hearing

At the two-day motion to suppress hearing, the State presented the testimony of New Jersey State Trooper Anthony Wolcott regarding the warrantless stop and search of defendant's rental car on November 19, 2014, at approximately 2:16 p.m. In addition, the State presented a motor vehicle recording (MVR) video from Wolcott's police cruiser, depicting the stop of defendant's vehicle and the subsequent interactions with him. Defendant testified as well.

Wolcott testified he was parked in his patrol car and running a speed detecting laser when he identified a vehicle traveling ninety miles per hour in a sixty-five-miles-per-hour zone. He proceeded to follow the vehicle and activated his lights to pull the vehicle over to the shoulder of the road. He testified the vehicle took some time to pull over, and he observed someone in the backseat moving around in the vehicle before it stopped.

When the vehicle stopped on the shoulder of the road and Wolcott walked to the car, Wolcott stated he smelled burnt marijuana when he asked defendant, the driver of the car, for his credentials. When Wolcott went back to his patrol car to check on defendant's credentials, he notified the dispatcher he smelled marijuana in defendant's vehicle. Upon returning to defendant's vehicle, Wolcott asked defendant to step out of the car. After defendant complied, Wolcott informed defendant he smelled burnt marijuana in the vehicle, whereupon defendant acknowledged marijuana had been smoked in the vehicle earlier that day. Wolcott told defendant he was being detained because of the marijuana odor and put him in the back of the patrol car after handcuffing him. Ossey Etienne, the backseat passenger in defendant's vehicle, was also handcuffed and placed in the patrol car with defendant.

4

Seeking to search defendant's car, Wolcott testified he read the consent-to-search form to defendant twice. After the first reading, Wolcott stated defendant "wanted to know if he could depart from the scene or what I would do if he said no to the search. . . . I explained to him that I would speak to my sergeant about requesting a search warrant . . . ." After Wolcott read the form a second time, he stated defendant "nodded yes, said sure. I said yes? He said yes. Shrugged his shoulders. Shrugged his shoulders." Wolcott radioed his sergeant informing him of defendant's consent to the search, without any comment from defendant. Even though defendant supposedly consented, Wolcott did not have him sign the form before the search because it was "[S]tate [P]olice policy approved by the [A]ttorney [G]eneral's [O]ffice . . . to request him to sign afterwards[.]" Defendant, however, refused to sign the consent-to-search form when he was taken to the police station.

On cross-examination, Wolcott was asked: "[F]rom the video itself, . . . would it be fair – just from listening from the layman's perspective . . . to say [defendant] . . . stated sure and yes in the video?" Wolcott responded: "From where I'm sitting that's what it looked like to me." He stated he read the consent-to-search form a second time because he was seeking a clear yes or no answer from defendant.

Wolcott proceeded to search defendant's car while another trooper, Joe Walsh, who had arrived at the scene for back-up, sat in the front seat of Wolcott's patrol car to keep an eye on the handcuffed defendant and Etienne in the backseat. Wolcott stated he could hear defendant from where he was searching defendant's car but heard no request by defendant to stop the search. Wolcott also stated Walsh never informed him that defendant voiced any objection while the search was being conducted.

When the MVR was played during the hearing, only a portion of the ninety-minute long video was played. Based upon Wolcott's testimony, the following was shown: Wolcott pulling defendant's car over and obtaining his credentials; Wolcott's interactions with defendant including the detainment, handcuffing, questioning, and readings of the consent-to-search form; Wolcott informing his sergeant that defendant consented to the search of his car; and the moving of defendant and Wolcott's cars to enable the search to be conducted on a safer stretch of the road.

Defendant testified he was traveling from Pennsylvania, where he visited his brother, to New York, where he lived. The car he was driving was rented from JFK Airport. He testified he did not know why Wolcott pulled him over because he "was on the cruise control at 65 [miles per hour]." He explained he

6

was arrested and placed in the back of Wolcott's patrol car because the trooper claimed to have smelled marijuana coming from his vehicle, but he did not have any marijuana on him or in the car.

Defendant testified that while handcuffed in the patrol car, Wolcott requested consent to search the rental car. He explained the first time he was asked he responded stating, "what would happen if I said no. Then the officer explained to me that a supervisor would come. Then the supervisor would have to okay the warrant[.]" Walcott asked him for consent again and he recalled responding by shrugging and telling him "I don't know. . . . I was basically trying to tell [Wolcott] that I was unsure of how the process works. And I was just waiting for a supervisor to arrive, which never happened."

Defendant testified that after saying "I don't know[,]" Wolcott began to search his vehicle. On cross-examination, defendant alleged he did not hear Wolcott radio his sergeant but did hear other comments Wolcott made. He maintained there was no other state trooper with him in the patrol vehicle while Wolcott was conducting the search. When asked if he objected to the search, defendant stated:

> I mean I couldn't object. I was arrested – well, detained, whatever they call it. And I was in the car with the windows up. So there was no way of me objecting until

A-5872-17T4

> after when I got back to the precinct he asked me to sign the consent.
>
> And I told him no.
>
> . . . .
>
> Because a supervisor never came and gave the okay for a warrant.

While cross-examining defendant, the State replayed a portion of the MVR video showing defendant's purported consent to the search.

The judge entered an order denying defendant's motion to suppress accompanied with a five-page written decision. The judge determined Wolcott had reasonable and articulable suspicion to pull defendant's car over because he was exceeding the speed limit. When Wolcott walked up to the car's driver's side, he smelled burnt marijuana emanating from inside the car. Defendant and his two passengers were ordered out of the car and detained in handcuffs.

"Based on the MVR and credibility determinations," the judge decided defendant gave knowing and voluntary consent to Wolcott's search. Commenting on Wolcott's testimony, the judge found that after Wolcott read the consent-to-search form to defendant twice, defendant shrugged his shoulders, gave an affirmative nod, and said "sure." The judge found defendant's statement unintelligible on the MVR video, but found "Wolcott's version more credible

under the totality of the circumstances."  The judge indicated the fact defendant remained silent when Wolcott confirmed consent to search over the radio, weighed in favor of Wolcott's testimony.

During the search, the judge determined defendant was in the backseat of Walsh's patrol car with Walsh in the front seat.  The judge found defendant's testimony that Walsh was not in the car with him during the search was not credible based upon Wolcott's testimony and the MVR video showed "the shadow of the backup patrol officer [(Walsh)] . . . exiting . . . Wolcott's car following the search."  The judge determined Wolcott found "a partially smoked marijuana cigarette and ninety-three (93) suspected fraudulent credit cards."[1] inside defendant's car.

B. Trial

The same judge who decided defendant's motion to suppress presided over the trial.  The State presented the testimony of Wolcott and New Jersey State Police Detective Kenneth Hoppe.  Defendant neither testified nor presented any witnesses.

---

[1]  Throughout the suppression motion and trial testimony and the judge's ruling, the cards seized in the search were referred to as "credit cards," "gift cards," "bank cards," or "debit cards."  For the sake of convenience, unless specified otherwise, we will use the generic term of "credit card."

Wolcott's testimony mirrored his suppression hearing testimony. He did, however, provide greater detail regarding the passengers in defendant's vehicle and the alleged contraband recovered during the car's search. He recalled the two passengers were Tavia Barnett, who was in the front passenger's seat, and Etienne, who was in the back seat directly behind Barnett. In his search, Wolcott found: (1) approximately .03 grams of marijuana in a partially smoked cigarette placed in a half-empty soda bottle in the center console; (2) four credit cards in the center console; (3) cigarette rolling papers and a credit card on Etienne's person; (4) four credit cards in the glove box; (5) one Visa gift card on defendant's person; (6) two credit cards in a handbag on the front passenger's floorboard; (7) two credit cards on the front passenger's seat; and (8) eighty-two credit, debit, and gift cards forming a rectangular brick of two organized stacks compressed in a McDonald's bag that was then placed in a plastic bag situated next to the handbag in the front passenger's floorboard.

Hoppe related his experience in investigating financial crimes, such as credit card fraud. He testified to the contents of his report which detailed the results of running eighty-three cards recovered by Wolcott's search through a Magtek Pin 201004008 Card Reader. Hoppe described the device as:

> [A] card reader[,] which was obtained from American
> Express to assist with credit card investigations by the

10

> State Police[,] and it is used to capture and record the information that's encoded on the magnetic strip on the back of credit cards and gift cards. . . . It attaches to a computer, records to a text file or Excel or a spreadsheet and you just run the card just the same as it would be run, you know, during the normal course of use.

He explained that by running a card through the mag reader, if it returned "a number encoded on the magnetic strip . . . consistent with the number printed on the face of the gift card" the card was legitimate. He testified after running each seized card through the mag reader, he determined most were fraudulent.

When pressed on cross-examination, Hoppe stated, "[t]here were numerous [cards] that were, at face value, fraudulent. Some of them you would probably have to subpoena further information to know for sure."[2] However, on redirect, Hoppe testified, based on his report, he believed with some level of support, primarily because the information on the mag strips of each card did not match the information on the front of the card, that sixty-three of the confiscated cards from the McDonald's bag and the glove box were fraudulent.

At the conclusion of the State's case, defendant moved for a judgment of acquittal as to the conspiracy charge. He argued the State presented "no evidence of an agreement either through direct or circumstantial evidence . . . to

---

[2] Based upon the contentions on appeal, it is unnecessary to address the exact information about each card.

show a conspiracy." The State opposed, contending that given defendant and his passengers were in a rental car with a large amount of credit cards located in several places in the car, the jury could infer defendant "was aware that they were in the car," had control over them, and he was part of the conspiracy or an accomplice for using them. Giving the State the benefit "of all its favorable testimony as well as favorable inferences which reasonably could be drawn therefrom," State v. Reyes, 50 N.J. 454, 459 (1967), the judge denied the motion. On the record, the judge noted the State established defendant was driving a rental car with two passengers and a large amount of fraudulent credit cards found inside, and a reasonable jury could determine "the vehicle was rented to obtain or later use the credit cards." The judge also held a reasonable jury could find defendant had agreed with the other passengers to obtain or use the credit cards.

As mentioned, the jury found defendant guilty of conspiracy to engage in the fraudulent use of credit cards. Defendant was sentenced to two years of probation, transferable to New York.

## II.

Defendant contends the judge erred in denying his motion to suppress the seizure of the credit cards. His challenge intertwines three issues: (1) whether

12

he gave consent to search the vehicle; (2) whether he had the ability to stop the search; and (3) whether his consent was voluntarily given or coerced. The State does not address every argument put forth by defendant and instead makes two opposing arguments: (1) the evidence relied on by defendant is not reviewable because it is not in the record; and (2) even if the MVR video was viewed, the judge had "ample support . . . [for his] finding that defendant knowingly and voluntarily consented to the search of the rented motor vehicle . . . ." The State does not address whether there was probable cause to search defendant's car based upon the odor of burnt marijuana.[3]

Before we separately address each issue raised by defendant, we briefly discuss some overriding principles. The United States Constitution and the New Jersey Constitution both guarantee the right of persons to be free from unreasonable searches and seizure in their home. U.S. Const. amend. IV; N.J.

---

[3] Pursuant to State v. Witt, 223 N.J. 409 (2015), police officers may conduct a warrantless, nonconsensual search during a lawful roadside stop "in situations where: (1) the police have probable cause to believe the vehicle contains evidence of a criminal offense; and (2) the circumstances giving rise to probable cause are unforeseeable and spontaneous." State v. Rodriguez, 459 N.J. Super. 13, 22 (App. Div. 2019) (citing Witt, 223 N.J. at 447-48). "New Jersey courts have [long] recognized that the smell of marijuana itself constitutes probable cause that a criminal offense ha[s] been committed and that additional contraband might be present." State v. Walker, 213 N.J. 281, 290 (2013) (internal quotation marks omitted) (quoting State v. Nishina, 175 N.J. 502, 515-16 (2003)).

Const. art. I, ¶ 7.  Warrantless searches are presumptively unreasonable unless, among other exceptions, voluntary consent to the search, without coercion or duress, is provided.  State v. Domicz, 188 N.J. 285, 308 (2006); see also State v. Bryant, 227 N.J. 60, 69 (2016).

An "essential element" of such consent is the individual's "knowledge of the right to refuse [it]."  State v. Johnson, 68 N.J. 349, 353-54 (1975).  Whether spoken or written, such "assent . . . is meaningless unless the consenting party understood his or her right to refuse" to give it.  State v. Suazo, 133 N.J. 315, 323 (1993) (citing Johnson, 68 N.J. at 353-54).  A person has the right to withdraw consent to search at any time by being present during the search, and failure to afford the person the opportunity to exercise such right will result in suppression of the search.  See State v. Hampton, 333 N.J. Super 19, 30 (App. Div. 2000).  Consent is generally a factual question, determined by an assessment of the totality of the circumstances.  State v. Koedatich, 112 N.J. 225, 264 (1988).  However, trial courts must adhere to established legal principles in evaluating those circumstances.

A. Proof of Consent

Defendant contends the judge erred both in his factual findings and application of the law when holding defendant gave consent to search his car.

14

With respect to the judge's factual findings, defendant contends he did not give "express and unequivocal consent to search his rental car . . . when he shrugged his shoulders after he was read the consent-to-search form for the second time[,]" as required by State v. Sugar, 100 N.J. 214, 233-35 (1985) (holding, inter alia, consent to must be "unequivocal"). Because the judge based his findings on the testimony of Wolcott and defendant, as well as viewing portions of the MVR video, his findings were influenced by his "opportunity to hear and see the witnesses," State v. Gamble, 218 N.J. 412, 424-25 (2014) (citation and internal quotation marks omitted), and we see no reason to disturb them because they were not "so clearly mistaken that the interests of justice demand intervention and correction," State v. Robinson, 200 N.J. 1, 15 (2009) (citation and internal quotation marks omitted). See State v. Elders, 192 N.J. 224, 244-45 (2007) (holding while an appellate court may view the same video as the trial court, the appellate court may not substitute its evaluation of the video particularly where the trial court's determination on the motion is also based on the judge's opportunity to hear and consider live testimony).

B. Ability to Withdraw Consent

Defendant seeks to discredit Wolcott's testimony that he had the opportunity to withdraw consent to search or stop the search of his vehicle. In

support, defendant points out Walcott's assertion that Walsh was with defendant inside Walsh's patrol car when Wolcott was searching his car is contradicted at the twelve-minute time frame of the MVR video where Walsh appears to be a head-shaped shadow standing outside of the patrol car.

Defendant, however, fails to point out this contention was not raised before the judge because this portion of the video during the suppression hearing was not viewed based on the parties' mutual agreement. Since the judge did not view this portion of the video in reaching his decision, we decline to do so. See Robinson, 200 N.J. at 20 (holding "appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest") (quoting Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973)).

Nonetheless, even accepting defendant's representations, that portion of the video is not instructive in determining the outcome of the suppression motion such that "the interests of justice demand intervention and correction" to allow its consideration. Elders, 192 N.J. at 243. At best for defendant, the video arguably shows Wolcott may not have known Walsh's every whereabouts while Wolcott searched the car. At worst for defendant, the video arguably shows

based on the shadow's location, Walsh could have been standing right next to the window where defendant was seated in the patrol car and in close enough proximity to allow defendant to waive, tap the window, or call out to get his attention. More importantly, the judge found defendant's own testimony about the whereabouts of Walsh during Walcott's search inaccurate. The judge identified, by way of shadows, that an admitted portion of the MVR video shows Walsh exiting the vehicle at the conclusion of the search.

In sum, we discern no basis in the record provided to take issue with the judge's factual findings that defendant gave consent to Wolcott to search his car.

C. Voluntariness of Consent

Defendant argues he did not provide voluntary consent to the search either orally or on the forms presented to him while he was already arrested and in handcuffs. Defendant maintains the trial judge incorrectly deemed the searches to be consensual, and the circumstances that produced his supposed consent were inherently coercive. We agree.

In its seminal opinion State v. King, 44 N.J. 346 (1965), our Supreme Court articulated a multi-prong test to guide our courts as to whether a person's consent for police to search a dwelling after a motor vehicle stop without a warrant was voluntary. Five decades later, the Court made clear in State v.

Hagans 233 N.J. 30, 39-43 (2018), the King factors must be considered when there is a question as to whether consent was voluntarily given to search a motor vehicle. The following five "King factors" weigh against voluntariness, and tend to show that a person's consent was coerced:

> (1) that consent was made by an individual already arrested; (2) that consent was obtained despite a denial of guilt; (3) that consent was obtained only after the accused had refused initial requests for consent to search; (4) that consent was given where the subsequent search resulted in a seizure of contraband which the accused must have known would be discovered; and (5) that consent was given while the defendant was handcuffed.
>
> [Id. at 352-53.]

Additionally, King delineated three offsetting factors that can weigh in favor of a finding of voluntariness. Those offsetting factors are whether: "(1) consent was given where the accused had reason to believe that the police would find no contraband; (2) defendant admitted his guilt before consent; (3) defendant affirmatively assisted the police officers." Id. at 353.

The Court in King explained that the "existence or absence of one or more of the above factors is not determinative of the [voluntariness] issue." Ibid. Because the factors "are only guideposts to aid a trial judge in arriving at his conclusion," a trial judge should determine the issue of voluntary consent by

considering "the totality of the particular circumstances of the case before him." Ibid.; see also Hagans, 233 N.J. at 42-43 (reiterating the King factors should not be applied mechanically because the totality of circumstances dictates the outcome). Ultimately, the Court concluded in King, that "the trial judge is in a better position to weigh the significance of the pertinent factors than is an appellate tribunal." Ibid. (emphasis added).

Here, the judge's written opinion upholding the search of defendant's car on consent grounds failed to address the King factors. Consequently, we remand this matter for the judge to reevaluate whether Wolcott had sufficient lawful grounds at the time of the motor vehicle stop based upon defendant's consent to search his car. If the judge finds such a lawful basis lacking, he shall issue appropriate relief, subject to the State's right of appeal. Conversely, if the judge rules the consent valid, defendant may file a new appeal from that determination.

### III.

Finally, we turn to defendant's contention the judge erred in denying his motion for a judgment of acquittal under Rule 3:18-1. The long-established standard to determine a motion for a judgment of acquittal at the conclusion of the State's case was articulated in Reyes:

> [T]he question the trial judge must determine is whether, viewing the State's evidence in its entirety, be

that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt.

[50 N.J. at 458-59 (citing State v. Fiorello, 36 N.J. 80, 90-91 (1961)).]

Under Rule 3:18-1, the judge "'is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the State.'" State v. Papasavvas, 170 N.J. 462, 521 (2002) (quoting State v. Kluber, 130 N.J. Super. 336, 342 (App. Div. 1974)). "If the evidence satisfies that standard, the motion must be denied." State v. Spivey, 179 N.J. 229, 236 (2004). We adhere to the same standard. R. 2:10-1 ("The trial court's ruling on such a motion shall not be reversed unless it clearly appears that there was a miscarriage of justice under the law."); see also State v. Kittrell, 145 N.J. 112, 130 (1996).

Applying these well-established principles to defendant's conviction of conspiracy to engage in the fraudulent use of credit cards, we discern no basis to set aside the jury's verdict.

Under N.J.S.A. 2C:21-6(h), the crime of fraudulent use of credit cards is defined as:

A person who knowingly uses any counterfeit, fictitious, altered, forged, lost, stolen or fraudulently obtained credit card to obtain money, goods or services, or anything else of value; or who, with unlawful or fraudulent intent, furnishes, acquires, or uses any actual or fictitious credit card, whether alone or together with names of credit cardholders, or other information pertaining to a credit card account in any form, is guilty of a crime of the third degree.

To convict defendant of conspiracy to commit this crime, the State had to satisfy N.J.S.A. 2C:5-2(a), which provides in pertinent part, that:

[a] person is guilty of conspiracy with another person or persons to commit a crime if with the purpose of promoting or facilitating its commission he:

(1) Agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) Agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

"[T]he agreement to commit a specific crime is at the heart of a conspiracy charge." State v. Samuels, 189 N.J. 236, 245 (2007). It is well settled that a conspiracy may be proven by circumstantial evidence. State v. Phelps, 96 N.J. 500, 509 (1984). Generally, circumstantial evidence is tested

by the rules of ordinary reasoning such as govern mankind in the ordinary affairs of life. While certain actions of each of the defendants, when separated from

21

the main circumstances and the rest of the case, may
appear innocent, that is not significant and undoubtedly
appears in every case of criminal conspiracy.

[Samuels, 189 N.J. at 246 (quoting State v. Graziani, 60
N.J. Super. 1, 13-14 (App. Div. 1959)).]

Hence, "[a]n implicit or tacit agreement may be inferred from the facts and circumstances[,]" State v. Kamienski, 254 N.J. Super. 75, 94 (App. Div. 1992), because co-conspirators generally act in silence and secrecy, State v. Cagno, 211 N.J. 488, 512 (2013).

Defendant contends, as he did before the trial judge, the State failed to prove "there was . . . evidence of an agreement among the three occupants of the [rental car] . . . to conspire to fraudulently use any credit cards." He asserts the "mere presence of others in the car" is not enough to prove there was a conspiracy. Defendant contends the presence of the credit cards in a bag owned by someone else, located next to the feet of Barnett, within her complete and sole control, does not establish he possessed the credit cards to prove he conspired to use them. He further submits the judge's determination the vehicle was rented with the "purpose of obtaining the fraudulent credit cards appears to have been [a] mistake[]" because the State did not present evidence it had been rented or when the rental period had started. Defendant points out he was pulled over nineteen days after he rented the vehicle, which was six days past the initial

22

return date, instead of renting it the same day the credit cards were found in the vehicle. Thus, he argues, the State did not show the rental was "with specific purpose of traveling to obtain [and or] use the fraudulent credit cards."

Defendant compares his situation to that of the defendants in State v. Shipp, 216 N.J. Super. 662 (App. Div. 1987) and State v. Lewis, 93 N.J. Super. 212 (App. Div. 1966), whose convictions were reversed because the State failed to prove possessory offenses. In Shipp, we held the State failed to prove defendant possessed controlled dangerous substances with intent to distribute where he was a passenger in a car and his stepmother, another passenger, tried to inconspicuously drop several sealed business envelopes containing heroin through the grate of a storm drain while the police were questioning the others. 216 N.J. Super. at 663-64. We reasoned the defendant's simple presence in the vehicle with his stepmother "did not suffice to authorize an inference that he was sharing in the intentional control and dominion over the contraband material." Id. at 666.

In Lewis, which was cited for support in Shipp, we reversed the defendant's conviction for unlawful possession of a gun found in a jacket – not owned by the defendant – in the front seat of a vehicle in which defendant was one of seven occupants and sitting in the back seat. 93 N.J. at 213-14.

23

Defendant asserts that like in Shipp and Lewis, the State's failure to establish more than mere presence in the vehicle with a passenger who controlled the fraudulent credit cards required an entry of acquittal. Defendant attempts to minimize the one fraudulent credit card found in the glove box alongside three non-fraudulent cards by stating "there was no evidence . . . [he] kept anything in that glove box, which was located immediately in front of Barnett."

We are unpersuaded by defendant's arguments. As the State points out, our Supreme Court's reasoning in State v. Palacio, 111 N.J. 543 (1988), undercuts defendant's reliance on Shipp. In Palacio, a driver and the defendant passenger were stopped for speeding and, after obtaining written consent from the driver to search the vehicle, a secreted compartment behind the back seat revealed fifteen pounds of cocaine. 111 N.J. at 458. The defendant was found guilty of possession with intent to distribute. Ibid. The Court rejected the defendant's argument that Shipp required a reversal of his conviction because: (1) the contraband was found in an open area where another occupant had access; (2) there was evidence supporting a conspiracy; and (3) the quantity of contraband was substantially larger than the few envelops of heroin and of greater value than found in Shipp. Id. at 551-53.

Giving the State the "benefit of all its favorable testimony as well as favorable inferences which reasonably could be drawn therefrom[,]" Reyes, 50 N.J. at 459, the situation here is akin to Palacio, where the amount of contraband and the accessibility of the contraband sustained the defendant's conviction. The fraudulent credit cards were scattered across the car: in the center console, in the glove box, on the seats, and in the McDonald's bag, without any indicia that it was owned or possessed by any particular person in the car. The cards were not on the persons of defendant's passengers, nor secreted in items the passengers had complete and sole control over; they were all accessible to defendant. Defendant's presence in a car he rented with so many fraudulent credit cards scattered therein is enough for a reasonable jury to conclude an agreement existed between the occupants to obtain and/or use the fraudulent cards as required under N.J.S.A. 2C:5-2(a).

Furthermore, and perhaps more importantly, defendant was found guilty of conspiracy to use fraudulent credit cards, not possession of fraudulent credit cards. The fact there were so many such cards found in a vehicle he rented and was driving establishes circumstantial evidence that a reasonable jury could apply to find him guilty of conspiracy to use them. Hence, the judge properly denied defendant's motion for a judgment of acquittal.

A-5872-17T4

Affirmed in part and reversed and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5872-17T4