**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3481-15T3

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

SEAN COURTER,

     Defendant-Appellant.

_____

Argued January 18, 2018 – Decided September 17, 2018

Before Judges Simonelli, Rothstadt and Gooden Brown.

On appeal from Superior Court of New Jersey, Law Division, Essex County, Indictment No. 14-01-0314.

Charles J. Uliano argued the cause for appellant (Chamlin, Rosen, Uliano & Witherington, attorneys; Charles J. Uliano, of counsel and on the briefs; Andrew T. Walsh, on the briefs).

Kayla E. Rowe, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Robert D. Laurino, Acting Essex

County Prosecutor, attorney; Kayla E. Rowe, of counsel and on the brief).

PER CURIAM

Following a jury trial, defendant Sean Courter, a former police officer, was convicted of second-degree conspiracy to commit official misconduct, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:30-2 (count one); second-degree official misconduct, N.J.S.A. 2C:30-2 (count two); third-degree tampering with public records or information, N.J.S.A. 2C:28-7(a)(2) (count three); fourth-degree falsifying or tampering with records, N.J.S.A. 2C:21-4(a) (count four); and fourth-degree false swearing, N.J.S.A. 2C:28-2 (count five).

At sentencing, Judge Michael L. Ravin merged count one with count two and sentenced Courter on count two to a five-year term of imprisonment with a five-year period of parole ineligibility, and imposed a concurrent three-year term on count three, and concurrent nine-month terms on counts four and five.

On appeal, Courter raises the following contentions:

> Point I
>
> THE CONVICTION MUST BE OVERTURNED BECAUSE THE JURY VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE.
>
> A.    STANDARD
> B.    CONSPIRACY
> C.    OFFICIAL MISCONDUCT

2

D.    UNDERLYING OFFENSES

Point II

THE CONVICTION MUST BE OVERTURNED DUE TO PROSECUTORIAL MISCONDUCT. (Not Raised Below).

A.    APPEAL TO RACE
B.    MISREPRESENTATION OF FACTS/LAW

1.    ELUDING
2.    SUFFICIENCY OF CRIMINAL CHARGES

Point III

THE CONVICTION MUST BE OVERTURNED BECAUSE THE FAILURE OF THE COURT TO CHARGE THE JURY AS TO THE REQUIREMENT TO COMPLY WITH AN OFFICER'S DIRECTION. (Not Raised Below).

Point IV

IMPROPER SENTENCE. (Not Raised Below).

We reject these contentions and affirm.

## The Underlying Incident

On June 7, 2012, Police Officers Sean Courter and Albert Sutterlin from the Township of Bloomfield Police Department (BPD) responded to a home on West Passaic Avenue on a report of a domestic violence incident between

3

Marcus Jeter and his girlfriend, Ms. T. Killian. In his incident report, Courter

gave the following version of what happened:

> Responded to . . . West Passaic Ave. on a report of a Domestic. Upon arrival Officer Sutterlin and I rang the doorbell to the residence. While ringing the doorbell a black male, later identified as Mr. Marcus Jeter, stuck his head out the second floor window and stated, "Come and get me". A female, later identified as Ms. [T] Killian, then opened the front. While speaking with Ms. Killian, the girlfriend, she stated that her boyfriend, Mr. Jeter, just jumped out the back window. Officer Sutterlin and I heard an engine starting from the rear of the residence. A vehicle . . . came up the driveway at a high rate of speed. I stated to the driver, Mr. Jeter, to put the vehicle in park and give me his identification. Mr. Jeter ignored my order to put the vehicle in park and stated, "I did not do anything wrong". I spoke to Mr. Jeter through the front passenger side window, which was rolled down. As Mr. Jeter was speaking, I smelled a strong odor of an alcoholic beverage emanating from his breath and his eyes being bloodshot. In further observing the vehicle I observed the rear driver tire to be flat. I asked Mr. Jeter again to put the vehicle in park and give me his identification. Mr. Jeter refused and drove off at a high rate of speed, making a left onto West Passaic Ave. I ran to my vehicle and advised Central Communications and [Lieutenant Sean] Schwindt that I was pursuing this vehicle. I activated my emergency lights and sirens and was able to view Mr. Jeter's vehicle make a right onto Broad St. from West Passaic Ave. Upon reaching Broad St., I observed Mr. Jeter's vehicle make a right onto Parkway South. I was able to catch up to Mr. Jeter's vehicle on the Parkway South. I pulled behind Mr. Jeter's vehicle, who continued to drive on the Parkway South. At this time, I observed the driver-side

rear tire to be sparking, due to that Mr. Jeter was driving on the rim. After approximately 1,000 feet, Mr. Jeter's vehicle became disabled, due to that the driver-side rear rim was on its side. Mr. Jeter's vehicle came to rest at mile marker 154.1 on the Parkway South. I exited my vehicle with my handgun drawn on Mr. Jeter, who was still in the vehicle with the engine running. I gave Mr. Jeter multiple commands to shut off the vehicle and show me his hands. Mr. Jeter refused and stated "Fuck You, I did not do anything". Officer Sutterlin then arrived on scene. At this time I proceeded to the drivers side door and attempted to open it. The door was locked. I again gave Mr. Jeter verbal commands to open the door. Mr. Jeter refused and stated "Fuck You" and then rolled up his driver side window. I advised Central Communications that Mr. Jeter was refusing to exit the vehicle. Officer Trinidad arrived on scene and blocked Mr. Jeter's vehicle in from the front, due to that Mr. Jeter refused to turn off his vehicle. I again gave Mr. Jeter verbal commands to unlock the driver side door and exit the vehicle. Mr. Jeter refused. I then used my ASP, which is an expandable baton, to break Mr. Jeter's driver side window. When the window was broke, I gave Mr. Jeter verbal commands to open the door. Mr. Jeter refused. While Officer Sutterlin and Officer Trinidad stood by, I reached into the driver side window and opened the door. While reaching into the broken window, my left forearm was scraped by the broken glass. I was able to open the door. I advised Mr. Jeter to take off his seatbelt. Mr. Jeter refused. I reached over Mr. Jeter and attempted to take off Mr. Jeter's seatbelt. <u>While attempting to take off Mr. Jeter's seatbelt, Mr. Jeter began grabbing onto my holster in an attempt to get my handgun. I advised Mr. Jeter multiple times to stop resisting. Officer Trinidad, Officer Sutterlin and I then attempted to take Mr. Jeter to the ground, at which time Mr. Jeter struck Officer Trinidad in the face with his fist</u>. We were then able to take Mr.

Jeter to the ground. <u>While on the ground Mr. Jeter put his hands underneath his body in an attempt not to be handcuffed. I advised Mr. Jeter multiple times to stop resisting and give me his hands.</u> Officer Trinidad and I were able to handcuff Mr. Jeter. Mr. Jeter was then placed into patrol vehicle 4.

[(Emphasis added).]

Courter also filled out a "Bloomfield Police Department DVD Discovery Form," which indicated that both his and Trinidad's patrol vehicles were equipped with video cameras, the cameras were on during the incident, and the hard drives were removed from the patrol vehicles after the incident and placed into evidence.

In his incident report, Sutterlin gave the following version of the incident:

Responded to . . . West Passaic Avenue on a report of a [d]omestic. Upon arrival, Mr. Jeter opened an upstairs window and yelled: "Come and get me!" This officer then rang the doorbell until Ms. Killian responded. Ms. Killian stated that she just wanted Mr. Jeter to leave for the evening and that when she had gone to the door, Mr. Jeter jumped out the back window. Mr. Jeter was stopped at the end of the driveway as he was trying to leave. Officer Courter requested Mr. Jeter's license and at this time, Mr. Jeter sped off, south on West Passaic Avenue. Mr. Jeter turned right onto Broad Street into the McDonald's [p]arking lot and then onto Garden State Parkway South. At mile marker 154.1, Mr. Jeter pulled over because his left rear tire had gone flat and the rim had broken. Mr. Jeter was ordered out of his vehicle and at this time, Mr. Jeter locked all the doors and rolled up all windows, refusing to come out. At

6

this time, Lieutenant Schwindt acknowledged to use all necessary force to effect an arrest. At this time, the driver's window was broken. Mr. Jeter refused to take off his seat belt and <u>while Officer Courter was reaching over him, Mr. Jeter attempted to gain control of Officer Courter's firearm</u>. Mr. Jeter was then extricated from the vehicle and ordered to the ground. <u>At this time, Mr. Jeter refused to submit to arrest and necessary force was used to effect an arrest</u>.

[(Emphasis added).]

<u>Criminal Charges Filed Against Jeter</u>

On June 7, 2012, Courter signed complaint warrants against Jeter charging him with second-degree eluding, N.J.S.A. 2C:20-2B; third-degree resisting arrest, N.J.S.A. 2C:29-2(a)(3)(a); second-degree attempting to disarm a police officer, N.J.S.A. 2C:12-11(a); and obstructing administration of law or other governmental function, a disorderly persons offence, N.J.S.A. 2C:29-1(a).[1]

On September 19, 2012, a grand jury indicted Jeter for second-degree eluding, N.J.S.A. 2C:29-2(b); second-degree attempting to disarm a police officer, N.J.S.A. 2C:12-11(a); third-degree aggravated assault on a law

---

[1] Courter also issued motor vehicle summonses to Jeter for driving while license suspended, N.J.S.A. 39:3-40; reckless driving, N.J.S.A. 39:4-96; refusal to submit to an alcohol test, N.J.S.A. 39:4-50.2; driving while intoxicated, N.J.S.A. 39:4-50; failure to comply with directions of officers, N.J.S.A. 39:4-57; driving while intoxicated 1000 feet from a school, N.J.S.A. 39:4-50.6; and creating risk of an accident, N.J.S.A. 39:4-56.

enforcement officer acting in the performance of his duties, N.J.S.A. 2C:12-1(b)(5)(a); and third-degree resisting arrest, N.J.S.A. 2C:29-2(a)(3)(a).

The Internal Affairs Investigation

Prior to his indictment, on June 12, 2012, Jeter filed a complaint against Trinidad and Courter with the Essex County Prosecutor's Office (ECPO), alleging they physically assaulted him. Jeter asserted that the officers turned on their police lights indicating for him to pull over, he pulled over, and "the cops approached [his] vehicle . . . beat him up and arrested him, never informing him why he was pulled over." He also alleged that a police vehicle crashed into the front of his vehicle. In response to Jeter's complaint, the ECPO contacted the BPD's Internal Affairs Division (IAD), which began an investigation.

In an interview with Lieutenant Michael J. Cofone of the IAD, Jeter said that he stopped his vehicle on the Garden State Parkway South after he saw the police lights and his tire started smoking. Once he stopped, he saw police officers on both sides of his vehicle pointing their guns at him saying "get the fuck out of the car." As soon as he saw their weapons, he put his hands up and complied with their instructions to turn off his vehicle. At that point, a police vehicle (driven by Trinidad) came from Garden State Parkway North and crashed into the front of his vehicle. After the officer on the left side of his

8

vehicle broke his window, the officers "opened his door and punched him in the face, he was caught off guard, the [o]fficers . . . tried to take off his seatbelt and 'elbowed [him] in the face two times.'" After the officers removed his seatbelt, "they slammed [him] to the ground . . . handcuffed [him,] . . . patted [him] down and put [him] in the police car." During the encounter he asked to call his lawyer. As a result of the incident, he suffered a sprained wrist and cuts and bruises on his left arm, right arm, wrist, chest, and face.

Cofone obtained Courter's and Sutterlin's incident reports, the video recording from only Courter's patrol vehicle, and radio and telephone recordings. He consulted with Detective Andrew Zachares and was told the video recording from Trinidad's patrol vehicle was not available.

Cofone instructed Trinidad, Courter, and Sutterlin to submit administrative reports of the incident. In his administrative report, Trinidad stated:

> On Thursday June 07, 2012[,] at approximately 00[:]14 hours[,] I was in marked unit #4 patrolling in my zone. Officer Sutterlin and Officer Courter received a call . . . that there was a domestic [violence incident] in progress at . . . West Passaic Avenue. I was originally dispatched by [C]ommunications[,] then I was told to disregard and resume patrol in my zone. Several minutes later Officer Courter relayed to Communications that [Jeter] . . . had fled the scene at a high rate of speed. . . . At this time I advised Central

that I would be making my way to the scene. I activated my emergency over head lights and sirens and began making my way to the scene when I heard Officer Courter's next transmission that [Jeter] . . . had gotten onto Parkway South and [Courter] continued the pursuit until [Jeter] finally pulled over at mile marker 154.1. I asked Central for authorization to go onto Parkway North so that I could expedite my arrival to assist Officer[s] Courter and . . . Sutterlin. Lieutenant Schwindt gave the approval and I took Parkway North to the motor vehicle stop. When I reached their location[,] I carefully crossed the black top median yielding to traffic. When I saw that no traffic was coming[,] I drove across [with the] lights and sirens still activated and parked my vehicle . . . bumper to bumper with . . . [Jeter's] vehicle so that he would not attempt to flee or use his vehicle as [a] weapon . . . . When I exited my vehicle[,] I observed Officer[s] Courter and . . . Sutterlin giving multiple commands . . . to [Jeter] to "[e]xit the vehicle . . . ." I immediately began giving verbal commands to . . . [Jeter] to "[e]xit the vehicle . . . [as he was] under arrest[.]" [Jeter] . . . .refused multiple verbal commands from Officer Courter and myself. At this time I verbally advised . . . [Jeter] that if he did not exit the vehicle we were going to breach the window to effect the arrest. [Jeter] . . . ignored my commands again stating[,] . . . "Fuck off![] I didn't do shit man[.]" Officer Courter then attempted to open the driver side door but the door was locked. Officer Courter then used his asp (expandable baton) and successfully breached the window. Multiple verbal commands were given to . . . [Jeter] to unlock the door and exit his vehicle, [but] he refused. Officer Courter reached into the driver side window and opened the door. Officer Courter ordered . . . [Jeter] to take off his seat belt and exit the vehicle. [Jeter] . . . refused to comply. <u>Officer Courter reached over . . . [Jeter] to take off his seat belt, at which time I observed . . . [Jeter]</u>

grabbing Officer Courter[']s service weapon which he had holstered on his right hip. Officer Courter yelled[,] . . . "He's grabbing my gun . . . [.]" Officer Courter gave . . . [Jeter] multiple[] commands to let go of his gun and stop resisting.  At that moment I was in fear for my partner[']s life and[] my own.  Officer Sutterlin and I proceeded to grab . . . Jeter's hands off [of] Officer Courter's gun. Officer Courter was able to remove [Jeter's] seatbelt . . . . [When] attempting to extradite . . . [Jeter] from the vehicle, [Jeter] struck me in the face with a closed fist.  After struggling with [Jeter,] we finally managed to take him to the ground.  On the ground . . . [Jeter] continued flailing his arms and then plac[ed] his hands underneath his body.  I ordered him to . . . [s]top resisting . . . [and g]ive me [his] hands[.]" And he refused.  After struggling with . . . Jeter we finally were able to grab his hands and place him under arrest.

[(Emphasis added).]

Courter's administrative report mirrored his incident report, and he added:

I had to reach over Mr. Jeter[] to remove his seatbelt, but as I was reaching over Mr. Jeter began grabbing onto my holster attempting to remove my handgun.  I was scared from my life.  I stated he is going for my gun.  Officer Trinidad and Officer Sutterlin immediately came to my aid and restrained Mr. Jeter's hands from removing my handgun.  Mr. Jeter continued to resist our efforts to arrest him.  We stated multiple times to stop resisting.  Mr. Jeter continued to flail his arms and body in an attempt not to be removed from the vehicle.

[(Emphasis added).]

11

Sutterlin provided more details of the incident in his administrative report, and added the following:

> At this time, Officer Courter stated that Mr. Jeter was attempting to take Officer Courter's weapon. At this time, this officer and Officer Trinidad reached in to assist Officer Courter and extricate Mr. Jeter during which time Mr. Jeter struck Officer Trinidad in the face. Mr. Jeter was ordered several times to stop resisting, but Mr. Jeter continued to fight with the officers. Mr. Jeter was brought to the ground and continued to resist by putting his hands underneath his body.
>
> [(Emphasis added).]

Cofone found that Jeter's conduct and behavior precipitated the event, he lacked credibility, was uncooperative, actively resisted the officers' attempt to arrest him, attempted to grab Courter's weapon, and punched Trinidad in the face. Cofone exonerated the officers, concluding the incident occurred, but the officers' actions were justified, legal, and proper. On August 1, 2012, Cofone notified Jeter that the investigation indicate[d] that the officers followed the appropriate department policies and procedures.

On April 3, 2013, the case was reopened after Michael Morris of the ECPO notified Cofone of the existence of the video recording from Trinidad's patrol vehicle, which showed a very different account of the incident than what

Trinidad, Courter and Sutterlin had reported. In his investigation report, Cofone stated:

> Chief Goul, Sgt. Sierchio and I reviewed the recording; the recording provides an almost unobstructed view of the passenger compartment of Mr. Jeter's vehicle. Trinidad responds from the GSP north bound side, crosses the grass median and the south bound lanes of traffic and strikes Mr. Jeter's vehicle at appx. 10-12 mph, Jeter immediately raises his hands; Trinidad exits his vehicle and runs around the passenger side of Jeter's vehicle. P.O. Courter can be seen at the driver side of [Jeter's] vehicle striking his window with an object, the window appears to then explode, and Courter then clears the broken glass from the window area. Courter then leans into the passenger compartment and opens the driver side door. As this occurs Jeter's hands remain up, Courter then appears to grab Jeter's left hand/arm as Jeter's right arm is still raised and remains [raised]. Jeter then leans toward the passenger side and his left arm becomes free and he raises his left arm along with his right arm; both of his hands remain raised the entire time. Courter is in the passenger compartment of [Jeter's] vehicle. Even when Courter appears to grab Jeter in a bear hug both of [Jeter's] hands remain raised; at no time can Jeter be seen grabbing in any area of Courter[']s body as his hands remain raised at the vehicle[']s passenger compartment roof. At no time does either P.O. Trinidad or P.O. Sutterlin enter the passenger compartment; additionally Trinidad does not appear on camera after he runs from his vehicle to Jeter's [vehicle] subsequent to his arrival at the scene. While Courter was leaning in the passenger compartment Sutterlin appears at the passenger side window and appears to strike the passenger side window but it does not break, he then walks to the rear of Jeter's vehicle and is not seen again.

> At no time does Jeter appear to punch Trinidad in the face.
>
> Chief Goul, Sgt. Sierchio and I viewed the recording several more times and did not view any attempt by Jeter to grab Courter in any way and at no time can Jeter be seen punching Trinidad. At no time do Sutterlin and Trinidad appear in the passenger compartment of Jeter's vehicle. There is no struggle by Trinidad or Sutterlin to remove Jeter's "hands" from Courter's weapon. At no time during the recorded events of this incident does a Supervisor respond to the scene of Jeter's arrest.
>
> [(Emphasis added).]

Cofone concluded from his review of the video that Courter lied in his two reports by falsely reporting: Jeter grabbed his gun; Trinidad and Sutterlin came to his aid and restrained Jeter's hands from removing the gun; Jeter flailed his arms and body "when in reality Jeter ha[d] his hands up in a gesture of surrender the entire time[;]" and Jeter struck Trinidad in the face with a closed fist. Cofone noted the video showed that Jeter's hands remained up as Courter pulled him from his vehicle, and Courter pulled him from the vehicle and threw him to the ground in one motion.

Cofone concluded that Trinidad lied in his administrative report about Jeter's actions and that Jeter physically assaulted him. Cofone noted the video showed that after Jeter was handcuffed and secured, Trinidad picked him up and

14

threw him onto the front passenger hood of Trinidad's patrol vehicle so hard that Jeter's feet came off the ground. The video also showed that Trinidad punched Jeter so hard in the head that his punch careened off Jeter and struck Courter in the face. Cofone also concluded that Sutterlin lied in his two reports that: Jeter tried to take Courter's gun; he and Trinidad assisted Courter; Jeter punched Trinidad in the face; and Jeter struggled.

Following an investigation by the ECPO, all charges against Jeter were dismissed. Specifically, the ECPO found from its review of the video recording from Trinidad's patrol vehicle "that [Jeter's] car was not in [the] sight line [of Courter's patrol vehicle] until shortly before [Jeter's] car was disabled and pulled to the shoulder of the [Garden State Parkway]. Therefore it would be impossible to impute to [Jeter] the knowledge that he was being pursued by police. For this reason the charge of [e]luding should be dismissed."

### The State's Evidence

Trinidad, Courter and Sutterlin were subsequently criminally charged. Sutterlin pled guilty to fourth-degree falsifying or tampering with records and agreed to testify against Trinidad and Courter.

Sutterlin testified that Trinidad and Courter were waiting for him at police headquarters when he returned there one or two hours after the incident. He

asked them what happened in order to provide a correct sequence of events, they told him what happened and what to write, and he wrote what they said in his report. Courter told Sutterlin that Jeter grabbed for his gun, but Sutterlin admitted he did not see this or see Jeter strike Trinidad. He admitted that he spoke to Trinidad and Courter several times about the incident before writing his administrative report to make sure he had the correct sequence of events. He also admitted his two reports were false, he knew they were false, he did not write them himself, and he was aided or helped by Trinidad and Courter.

Jeter testified that he did not elude the police, resist arrest, attempt to disarm Courter, or hit Trinidad. The video recording from Trinidad's patrol vehicle, which was played several times to the jury, corroborated Jeter's testimony and showed his hands were raised in a surrender gesture, and Trinidad assaulted him.

## I.

Courter contends in Point I that the jury verdict was against the weight of the evidence; however, he did not file a motion for a new trial on this issue. "[T]he issue of whether a jury verdict was against the weight of the evidence shall not be cognizable on appeal unless a motion for a new trial on that ground was made in the trial court." R. 2:10-1. While this court need not entertain a

16 <span>A-3481-15T3</span>

weight of the evidence argument in the absence of a new trial motion, it may nevertheless choose to do so in the interest of justice. State v. Smith, 262 N.J. Super. 487, 511 (App. Div. 1993); Pressler & Veriero, Current N.J. Court Rules, cmt. 3 on R. 2:10-1 (2018). We address this issue in the interests of justice and for the sake of completeness.

"In considering whether a jury verdict was against the weight of the evidence, our task is to decide whether 'it clearly appears that there was a miscarriage of justice under the law.'" State v. Smith, 262 N.J. Super. 487, 512 (App. Div. 1993) (quoting R. 2:10-1). We "must sift through the evidence 'to determine whether any trier of fact could rationally have found beyond a reasonable doubt that the essential elements of the crime were present.'" Ibid. (quoting State v. Carter, 91 N.J. 86, 96 (1982)). However, "[we] may not overturn the verdict 'merely because [we] might have found otherwise upon the same evidence.'" Ibid. (quoting State v. Johnson, 203 N.J. Super. 127, 134 (App. Div. 1985)). "[Our] intervention is warranted only to correct an 'injustice resulting from a plain and obvious failure of the jury to perform its function.'" Ibid. (quoting Johnson, 203 N.J. Super. at 134). "Where the jury's verdict was grounded on its assessment of witness credibility, a reviewing court may not intercede, absent clear evidence on the face of the record that the jury was

mistaken or prejudiced."  Ibid. (citing State v. Haines, 20 N.J. 438, 446-47 (1956)).  Applying these standards, we discern no reason to grant Courter a new trial.

<u>Conspiracy to Commit Official Misconduct</u>

N.J.S.A. 2C:5-2(a) provides:

> A person is guilty of conspiracy with another person or persons to commit a crime if with the purpose of promoting or facilitating its commission he:
>
> (1)    Agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
>
> (2)    Agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

"[T]he agreement to commit a specific crime is at the heart of a conspiracy charge."  State v. Samuels, 189 N.J. 236, 245 (2007). "It is the agreement that is pivotal."  Id. at 246.

"A conspiracy conviction does not turn on 'doing the act, nor effecting the purpose for which the conspiracy is formed, nor in attempting to do them, nor in inciting others to do them, but in the forming of the scheme or agreement[.]" State v. Ball, 141 N.J. 142, 178 (1995) (alteration in original) (quoting State v. Carbone, 10 N.J. 329, 337 (1952)).  Likewise, "mere knowledge, acquiescence,

18

or approval of the substantive offense without an agreement to cooperate, is not enough to establish one as a participant in a conspiracy." State v. Abrams, 256 N.J. Super. 390, 410 (App. Div. 1992). "It is the agreement that is pivotal." Samuels, 189 N.J. at 246.

In determining whether the scheme or agreement was formed, "[j]uries are routinely instructed that they may draw logical inferences from the evidence presented to them and that circumstantial evidence is of as equal weight as direct evidence. Courts have regularly held that conspiracy may be proven through circumstantial evidence." State v. Cagno, 211 N.J. 488, 512 (2012). However, "[t]here must be intentional participation with the purpose of furthering the goal of committing the crime." Cannel, New Jersey Criminal Code Annotated, cmt. 5 on N.J.S.A. 2C:5-2 (2010). Further, the essential elements of conspiracy must be evaluated in terms of the underlying offense. Samuels, 189 N.J. at 246-47.

Courter argues the State failed to prove the elements of conspiracy, as there was no evidence that he and Trinidad entered into an agreement between themselves or with Sutterlin to falsify their reports.

Contrary to this argument, there was sufficient evidence on which the jury could rationally have found beyond a reasonable doubt that Courter formed an agreement with Trinidad and Sutterlin to falsify their police reports. Sutterlin

A-3481-15T3

testified that Courter and Trinidad were waiting for him at police headquarters when he returned after the incident and told him what happened and what to write in his incident report. Sutterlin also testified that he spoke with Courter and Trinidad several times before writing his administrative report to make sure he had the sequence of events correct. From this evidence, the jury could reasonably infer that the officers conspired to falsify their reports in order to exonerate Courter and Trinidad of any wrongdoing toward Jeter and substantiate the false criminal charges brought against him.

In addition, the three officers' reports provided sufficient circumstantial evidence on which the jury could rationally have found beyond a reasonable doubt that Courter conspired with Trinidad and Sutterlin to falsify their police reports. The version of events contained in the officers' reports are strikingly similar. They use substantially the same language in describing the events, and they reported a substantially similar sequence of events not seen on the video recording from Trinidad's patrol vehicle. Thus, Sutterlin's testimony, the police reports, and the video recording from Trinidad's patrol vehicle could lead a reasonable jury to logically infer that Courter conspired with Trinidad and Sutterlin to falsify their reports.

## Official Misconduct

N.J.S.A. 2C:30-2 provides, in pertinent part:

> A public servant is guilty of official misconduct when, with purpose to obtain a benefit for himself or another or to injure or to deprive another of a benefit:
>
> a.    He commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized or he is committing such act in an unauthorized manner[.]

Courter conceded he was a public servant and that the act in question related to his public office.  Thus, the State had to prove beyond a reasonable doubt that he committed an act relating to his office knowing it was unauthorized or committed the act in an unauthorized manner knowing the manner was unauthorized, and whether his purpose in so acting was to benefit himself or another or to injure or deprive another of a benefit.  See Model Jury Charges (Criminal), "Official Misconduct (N.J.S.A. 2C:30-2)" (2006).

"The commission of the act . . . must constitute an unauthorized exercise of [the public servant's] official functions.  The public servant must know that the act   . . . was unauthorized or that the act . . . was done in an unauthorized manner." Ibid.

> An act is "unauthorized" if it is committed in breach of some prescribed duty of the public servant's office.   This   duty   must   be   official   and   non-

21

discretionary, imposed upon the public servant by law (such as statute, municipal charter or ordinance) or clearly inherent in the nature of his/her office. The duty to act must be so clear that the public servant is on notice as to the standards that he/she must meet. In other words, the failure to act must be more than a failure to exhibit good judgment. In addition, the State must prove that (defendant) knew of the existence of his/her non-discretionary duty to act prior to the incident in question. Not every unauthorized act committed by a public servant rises to the level of official misconduct; an unauthorized act amounts to official misconduct only if the public servant knew at the time that his/her conduct was unauthorized and unlawful.

[Ibid.]

"Benefit means a gain or advantage, or anything regarded by the beneficiary as a gain or advantage, including a pecuniary benefit or a benefit to any other person or entity in whose welfare he/she is interested." Ibid. The benefit does not have to be pecuniary, but could amount to enjoyment or self-gratification. State v. Quezada, 402 N.J. Super. 277, 285 (App. Div. 2008).

Here, there was sufficient evidence on which a reasonable jury could find beyond a reasonable doubt that Courter committed an act relating to his office knowing it was unauthorized or committed the act in an unauthorized manner knowing the manner was unauthorized. The jury found him guilty beyond a reasonable doubt of the underlying acts of tampering with public records,

falsifying or tampering with records, and false swearing, all of which are unauthorized criminal acts relating to his office.

In addition, Courter admitted at trial he was "aware that [the BPD] has rules and regulations that specify that, 'No employee shall falsify any official report'?[,]" which included "to enter, or to cause to be entered any inaccurate, or false, or improper, information." For him to argue there was no evidence he knowingly or willfully acted in an unauthorized manner in falsifying his police reports and the complaint warrants defies logic.

There also was sufficient evidence on which a reasonable jury could find beyond a reasonable doubt that Courter's purpose in committing the unauthorized acts was to benefit himself or another or injure or deprive Jeter of a benefit. The jury could logically infer from the evidence that Courter had the purpose to benefit himself and Trinidad by hiding their unlawful misconduct to protect them from forfeiture of their jobs and pensions and from potential liability for assaulting Jeter. They were initially exonerated of assaulting Jeter and, but for discovery of the video recording from Trinidad's patrol vehicle, would have remained police officers while Jeter faced serious criminal charges and a potential prison term for crimes he did not commit.

The Underlying Offenses

23

N.J.S.A. 2C:28-7(a) (tampering with public records or information), provides in pertinent part:

> A person commits an offense [of tampering with public records or information] if he:
>
> (1)   Knowingly makes a false entry in, or false alteration of, any record, document or thing belonging to, or received or kept by, the government for information or record, or required by law to be kept by others for information of the government;
>
> (2)   Makes, presents, offers for filing, or uses any record, document or thing knowing it to be false, and with purpose that it be taken as a genuine part of information or records referred to in paragraph (1); or
>
> (3)   Purposely and unlawfully destroys, conceals, removes, mutilates, or otherwise impairs the verity or availability of any such record, document or thing.
>
> [(Emphasis added).]

N.J.S.A. 2C:21-4(a) (falsifying or tampering with records), provides, in pertinent part, that "a person commits a crime of the fourth degree if he falsifies, destroys, removes, conceals any writing or record, or utters any writing or record knowing that it contains a false statement or information, with purpose to deceive or injure anyone or to conceal any wrongdoing."  (Emphasis added).

N.J.S.A. 2C:28-2(a) (false swearing), provides, in pertinent part, that "[a] person who makes a false statement under oath or equivalent affirmation, or

swears or affirms the truth of such a statement previously made, <u>when he does not believe the statement to be true</u>, is guilty of a crime of the fourth degree." (Emphasis added). "To establish a defendant's guilt under N.J.S.A. 2C:28-2(a), the State must prove that a particular statement was false and not believed by the defendant to be true." <u>State v. Bzura</u>, 261 N.J. Super. 602, 610 (App. Div. 1993). To be convicted under N.J.S.A. 2C:28-2(a), "the false swearing [must be] willful and intentional." <u>State v. Angelo's Motor Sales, Inc.</u>, 125 N.J. Super. 200, 206 (App. Div. 1973) (holding that to be convicted under N.J.S.A. 2C:28-2(a), "the false swearing [must be] willful and intentional"). All three crimes required Courter to knowingly make a false statement.

Courter argues there was no evidence he knowingly made false statements in his reports and the complaint warrants. He posits the statements were based on what he perceived to be a true and accurate representation of his recollection of the events in question, and the video recording from Trinidad's patrol vehicle did not definitively prove he did not believe what he wrote in his reports.

Contrary to this argument, there was sufficient evidence on which a reasonable jury could find Courter guilty beyond a reasonable doubt of all three crimes. Sutterlin's testimony, along with all of the police reports and video recording from Trinidad's patrol vehicle show Courter's version of events was

false, but he included that version in his reports and falsely charged Jeter based on that version. The jury viewed the video recording several times and apparently found it did not support Courter's claim that he believed Jeter grabbed onto his holster in an attempt to get his handgun, and that Jeter assaulted Trinidad and resisted arrest.

As previously noted, Courter admitted he was aware of the BPD's rules and regulations prohibiting employees from falsifying an official report, including entering inaccurate, false, or improper information. In addition, Sutterlin testified he knew the events in his reports did not occur, but put them in the reports because Courter and Trinidad told him what to write, which could lead a jury to logically infer Courter also knew the reports and complaint warrants were false.

Moreover, the video recording from Trinidad's patrol vehicle showed Jeter had his hands up for the entirety of the incident, except for a few seconds when Courter and Trinidad tried to extract him from the vehicle. The video did not show Jeter punching Trinidad in the face, reaching for Courter's holster, or resisting arrest, which could further lead a jury to logically infer that Courter knew his reports and complaint warrants were false, but put these facts in them

nonetheless and falsely charged Jeter with several crimes and motor vehicle offenses he did not commit.

Furthermore, although Courter testified he did not know if it was Jeter who grabbed his holster, he nevertheless charged him with third-degree attempting to disarm a police officer. He admitted that if he was not sure whether Jeter tried to grab his gun, he would have had to clarify that in his complaint warrants, inform his superiors, and withdraw the complaints, none of which he did. The evidence in this case was more than sufficient for the jury to find Courter guilty of the underlying offenses beyond a reasonable doubt.

## II.

### A.

On direct examination, Jeter referenced the high profile police brutality cases involving Amadou Diallo, Rodney King, and Sean Bell to explain why he did not exit his vehicle when ordered to exit and kept his hands raised. Jeter testified:

> So, as I was saying before, I grew up in a society where, you know, you watch these, uh, these situations with police brutality – you watch the Sean Bells, the Amadou Diallos, the Rodney Kings, the Oscar and Fruitvale Stations, and . . . I can testify that I'm a victim of that. I can say that this is my testimony.

27

Courter's counsel withdrew his objection to this testimony, and Judge Ravin gave a limiting instruction that the jury could only use this testimony if it found it was relevant to Jeter's state of mind in acting the way he acted. Counsel cross-examined Jeter on this testimony.

Judge Ravin later gave another limiting instruction to the jury that "[w]hatever the three attorneys say to you in giving their summations, it's not evidence. The evidence came from the witness stand, by testimony and anything I admitted into evidence." Prior to summations, the judge again instructed the attorneys to only make comments about Jeter's testimony if it went to state of mind, to which Courter did not object. Judge Ravin then instructed the jury:

> Likewise, it's been agreed, based on Mr. Jeter's testimony, that, if either side wants to talk about his testimony concerning Rodney King, or Mr. Diallo, or any of those cases, that each side may comment on it only insofar as his testimony went to his state of mind at the time in question, should the jury find that that is material, and all parties find that his state of mind is material.

During summation, the prosecutor made two brief comments about Jeter's testimony. The first was:

> But [Jeter] figures, he knows, and he told you, "I grew up in a society in which, this type of situation, you have to be very careful, because, if I make any gestures, and it's interpreted the wrong way, I'm going to be shot." That's what Marcus told you.

And he's afraid. He's afraid for his life.

The second was: "[Jeter's] been sitting passively the whole time, and the only reason he didn't get out of the car was because he was afraid to get shot, but his hands have been up the whole time."

Courter argues for the first time on appeal in Point II that his conviction must be overturned because the prosecutor's summation comments improperly appealed to race to justify or excuse Jeter's failure to comply with the orders of the police.

When a defendant raises prosecutorial misconduct for the first time on appeal, this court need only be concerned with "whether the remarks, if improper, substantially prejudiced the defendant['s] fundamental right to have the jury fairly evaluate the merits of [his or her] defense, and thus had a clear capacity to bring about an unjust result." State v. Johnson (Johnson I), 31 N.J. 489, 510 (1960). Even where a prosecutor has been guilty of misconduct, reversal of a defendant's conviction is not necessary unless the conduct was so egregious that it deprived the defendant of a fair trial. State v. Wakefield, 190 N.J. 397, 437 (2007). "Thus, '[t]o justify reversal, the prosecutor's conduct must have been clearly and unmistakably improper, and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits

29

of his defense.'" Id. at 438 (quoting State v. Papasavvas, 163 N.J. 525, 625 (2000)). To reverse for plain error, we must determine whether there is a real possibility the error led to an unjust result, that is, one "sufficient to raise a reasonable doubt as to whether [it] led the jury to a result it otherwise might not have reached." State v. Ross, 229 N.J. 389, 407 (2017) (quoting State v. Williams, 168 N.J. 323, 336 (2001)).

"Prosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented." State v. Frost, 158 N.J. 76, 82 (1999). If no objection is made to the remarks, they will generally not be deemed prejudicial. Ibid. Failure to object indicates that defense counsel did not consider the comments improper at the time they were made, and failure to object also deprives the court of the "opportunity to take curative action." Id. at 84.

A prosecutor must "confine [his or her] comments to evidence revealed during the trial and reasonable inferences to be drawn from that evidence . . . [I]f a prosecutor's arguments are based on the facts of the case and reasonable inferences therefrom, what is said in discussing them, 'by way of comment, denunciation or appeal, will afford no ground for reversal.'" State v. Smith (Smith II), 167 N.J. 158, 178 (2001) (quoting Johnson I, 31 N.J. at 510.

Prosecutors are permitted to "respond to an issue or argument raised by defense counsel." State v. Johnson (Johnson III), 287 N.J. Super. 247, 266 (App. Div. 1996).

"Summations must be 'fair and courteous, grounded in the evidence, and free from any "potential to cause injustice.'" Risko v. Thompson Muller Automotive Group, Inc., 206 N.J. 506, 522 (2011) (quoting Jackowitz v. Lang, 408 N.J. Super. 495, 505 (App. Div. 2009)). However, "[p]rosecutors are permitted 'to make vigorous and forceful closing arguments to juries.'" State v. Atwater, 400 N.J. Super. 319, 335 (App. Div. 2008) (quoting State v. Timmendequas, 161 N.J. 515, 587 (1999)). "Nevertheless, prosecutors must limit their remarks to the evidence . . . and refrain from unfairly inflaming the jury." Ibid. (citations omitted). "Where they cross the line beyond fair advocacy and comment, and have the ability or 'capacity' to improperly influence the jury's 'ultimate decision making,' the trial judge must take action." Risko, 206 N.J. at 522 (quoting Bender v. Adelson, 187 N.J. 411, 416 (2006)).

"In reviewing closing arguments, we look, not to isolated remarks, but to the summation as a whole." Atwater, 400 N.J. Super. at 335. If "[t]he comments were only a small portion of a summation which was largely devoted to a fair review of the evidence" and if "the trial court fully instructed the jury that its

verdict should be based solely on the evidence and that summations by counsel were not to be considered as evidence[,]" then the comments would not be so inflammatory as to deny defendant a fair trial. State v. Tirone, 64 N.J. 222, 229 (1974). To the contrary, if the comments on summation are not based on the evidence presented at trial, the comments may constitute reversible error. See State v. Coyle, 119 N.J. 194, 220-21 (1990).

We discern no error, let alone plain error, in the prosecutor's summation comments. The comments were within the parameters set by Judge Ravin and agreed to by the parties before summations, as they went to Jeter's state of mind. The prosecutor avoided mentioning the names of the other high profile cases or excessively focusing on Jeter's state of mind. Looking at the summation as a whole, the two comments were a brief five sentences within the context of a fifty-page summation. The comments did not appeal to race or inflame the jury and were in no way unduly prejudicial to Courter. The comments do not constitute plain error of prosecutorial misconduct warranting reversal.

### B.(1)

Courter argues for the first time on appeal that his conviction must be overturned because on summation the prosecutor misrepresented the facts and

law regarding the elements of eluding and the vehicular pursuit policy. We disagree.

## Eluding

Courter argues the prosecutor improperly led the jury to believe that Jeter did not commit the offense of eluding and Courter was not justified in pursuing him. He posits that Jeter committed the crime of eluding, as there was no dispute he knew Courter was a police officer and Courter ordered him to stop his vehicle. He also posits his pursuit was justified because he noticed alcohol on Jeter's breath and Jeter's car had a flat tire and was in an unsafe condition to drive.

Courter's argument lacks merit. First, this case was not about Jeter eluding the police or the police engaging in an improper pursuit. It was about three officers conspiring to lie in order to cover up their wrongdoing and substantiate the false criminal charges brought against Jeter.

Nonetheless, it was not improper for the State to argue the issues of eluding. N.J.S.A. 2C:29-2(b) provides:

> Any person, while operating a motor vehicle on any street or highway in this State or any vessel . . . who knowingly flees or attempts to elude any police or law enforcement officer after having received any signal from such officer to bring the vehicle or vessel to a full stop commits a crime of the third degree; except that, a person is guilty of a crime of the second degree if the

33

flight or attempt to elude creates a risk of death or injury to any person[.]

"[E]luding consists simply of 'knowingly' fleeing or attempting to elude a law enforcement officer by motor vehicle after receiving a signal to stop." State v. Mendez, 345 N.J. Super. 498, 506 (App. Div. 2001).

> The "attendant circumstances" of eluding under [N.J.S.A.] 2C:29-2b are that the defendant must "hav[e] received [a] signal . . . to bring the vehicle . . . to a full stop" and the person giving the signal must have been a "police or law enforcement officer." The "forbidden conduct" is "flee[ing] or attempt[ing] to elude." The material elements of eluding do not include any required "result" of such conduct.
>
> [Id. at 507 (alteration in original).]

It also was not improper for the State to argue the vehicular pursuit policy. The New Jersey Vehicle Pursuit Policy provides that a police officer may start a pursuit:

> a.    When the officer reasonably believes that the violator has committed an offense of the first or second degree, or an offense enumerated in Appendix A of this policy, or
> b.    When a police officer reasonably believes that the violator poses an immediate threat to the safety of the public or other police officers.
>
> [Robert Ramsey, 25 New Jersey Practice, § 19:3 (4th ed. 2009).]

34                                                                              A-3481-15T3

Appendix A provides the following enumerated offenses: vehicular homicide, N.J.S.A. 2C:11-5; aggravated assault, N.J.S.A. 2C:12-1(b); criminal restraint, N.J.S.A. 2C:13-2; aggravated criminal sexual contact, N.J.S.A. 2C:14-3(a); arson, N.J.S.A. 2C:17-1(b); burglary, N.J.S.A. 2C:18-2; automobile theft, N.J.S.A. 2C:20-2; theft by extortion, N.J.S.A. 2C:20-5; escape, N.J.S.A. 2C:29-5; and manufacturing, distributing or dispensing of controlled dangerous substances, N.J.S.A. 2C:35-(5)b.

The issue of eluding was directly related to the timeline of events and the charges brought against Courter. One of the charges was false swearing stemming from the criminal charges Courter brought against Jeter, including eluding. Thus, it was necessary for the State to discuss whether there was evidentiary support for the charges to which Courter swore. In addition, the prosecutor did not misrepresent the elements of eluding, as the prosecutor directly quoted the offense as stated in the complaint warrants Courter signed. Moreover, Courter raised the argument that Jeter eluded to further his defense that he committed no wrongdoing and properly charged Jeter with eluding. The prosecutor's comments properly responded to this argument.

It was not improper for the prosecutor to comment on the vehicular pursuit policy, as it helped contextualize the timeline of events and was relevant to

35

whether Courter charging Jeter with obstructing the administration of law or other governmental function constituted false swearing. In addition, even if we found it was improper to discuss eluding or the vehicular pursuit policy, it would not constitute plain error warranting reversal.

### B.(2)

Courter argues for the first time on appeal that his conviction must be overturned because on summation the prosecutor misrepresented the facts and law regarding the sufficiency of the criminal charges filed against Jeter. He posits that the prosecutor made misrepresentations to the jury "that material facts were omitted from the criminal charges filed against Jeter, thereby creating an inference that the charges were fraudulent," which were clearly capable of producing an unjust result.

Rule 3:2-1(a) provides that "[t]he complaint shall be a written statement of the essential facts constituting the offense charges made on a form approved by the Administrative Director of the Courts[.]" "In criminal matters, a complaint is supposed to inform a defendant of the charges he must defend against." State v. Salzman, 228 N.J. Super. 109, 114 (App. Div. 1987). "The complaint must contain enough information to enable the accused to defend himself and avoid the risk of successive prosecutions from the same

transgressions." Ibid. "Due process requires that the charging instrument not only inform a defendant respecting the nature of the charge, but it must also inform an accused of how many charges he or she faces and when they occurred." Ibid.

As Courter argues, there is no requirement that all of the facts of a case must be included in the complaint. However, the sufficiency of the criminal charges was at issue in this case due to the allegations of false swearing. Thus, it was proper for the prosecutor to argue that Courter omitted pertinent facts of the case, such as Jeter's alleged intoxication.

However, even if we found it was improper for the prosecutor to discuss this issue, it was only a small portion of the State's argument that would not have changed the jury's verdict. Thus, we conclude it does not amount to reversible error under the plain error standard, as it would not mislead a jury.

### III.

In Point III, Courter contends for the first time on appeal that his conviction must be overturned because Judge Ravin failed to charge the jury that Jeter had an affirmative duty to comply with a police officer's direction both at Killian's residence and on the Garden State Parkway. He posits that this produced an unjust result because the omission of this charge lead to the

37

compounding of the misconduct regarding the prosecutor's appeal to race, as well as the mistaken impression that Jeter's failure to comply with the officers' directions was justified or excused.

When a defendant fails to object to an error regarding a jury charge, we review for plain error. State v. Funderburg, 225 N.J. 66, 79 (2016). "Under that standard, we disregard any alleged error 'unless it is of such a nature as to have been clearly capable of producing an unjust result.'" Ibid. (quoting R. 2:10-2). "The mere possibility of an unjust result is not enough. To warrant reversal . . . an error at trial must be sufficient to raise 'a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached.'" Ibid. (alteration in original) (quoting State v. Jenkins, 178 N.J. 347, 361 (2004)).

It is unclear how a jury charge as to the requirement to comply with an officer's direction would have impacted the jury's decision. Rather, it would have confused the jury as to the law pertinent to the charges against Courter. Courter was not charged with assault, only of tampering with records, falsifying records, false swearing, official misconduct, and conspiracy to commit official misconduct. Judge Ravin instructed the jury as to each of these offenses. The judge meticulously discussed each element of each offense and explained that the jury must find each element beyond a reasonable doubt. Thus, the judge

gave the appropriate and proper jury charges relevant to this trial.  See State v. Baum, 224 N.J. 147, 158-59 (2016).  The jury charge Courter requests for the first time on appeal had no bearing on the jury's determination of the charged offenses and did not lead to an unjust result.

IV.

In Point IV, Courter argues, and the State agrees, that his conviction on the underlying offenses should have merged with his conviction for official misconduct.  Accordingly, we remand for resentencing to merge counts one, three, four, and five with count two.

Courter's conviction and sentence on count two are affirmed.  This matter is remanded for resentencing to merge counts one, three, four, and five with count two.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3481-15T3