# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2737-23

R.A.D.,[1]

    Plaintiff-Respondent,

v.

C.D.,

    Defendant-Appellant.

_____

Argued April 3, 2025 – Decided June 30, 2025

Before Judges Perez Friscia and Bergman.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Ocean County, Docket No. FV-15-1353-24.

Melissa E. Cohen argued the cause for appellant (SeidenFreed LLC, attorneys; Victoria D. Miranda, of counsel and on the briefs).

Danielle Walker argued the cause for respondent (Javerbaum, Wurgaft, Hicks, Kahn, Wikstrom and Sinins, PC, attorneys; Danielle Walker, on the brief).

---

[1] We use initials to protect the confidentiality of the victim in these proceedings. R. 1:38-3(d)(10).

PER CURIAM

Defendant C.D. appeals from a final restraining order (FRO) entered against her under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35, after a two day hearing. Defendant contends the trial court erred by: (1) finding plaintiff's factual assertions constituted the offense of harassment under the PDVA; (2) rejecting defendant's cohabitation defense and finding defendant was required to hire a private investigator to support this claim; and (3) drawing a negative inference against defendant and accepting plaintiff's testimony in full.

After our careful review of the record, we conclude the trial court did not abuse its discretion in granting an FRO as its findings under the two prongs of Silver,[2] its rejection of defendant's cohabitation defense, and its determination concerning defendant's election not to testify at the hearing were supported by credible and substantial evidence adduced at the hearing. Therefore, we affirm.

I.

The parties were married in 1998. During the marriage, their principal residence was in Cranford. They also owned a beach house in Mantoloking. On January 14, 2024, plaintiff filed his complaint under the PDVA and obtained a

---

[2] Silver v. Silver, 387 N.J. Super. 112 (App. Div. 2006).

temporary restraining order (TRO) against defendant.  At the time of the filing of the complaint, plaintiff was residing in the Mantoloking property and defendant was residing in the Cranford property since their separation in November 2023.  Plaintiff's complaint alleged the domestic violence predicate acts of harassment and stalking.[3]  The complaint averred that on January 14, 2024 defendant "drove past the [plaintiff]'s residence four times . . . between the hours of 05[:]57 HRS and 06[:]49 HRS and then had a friend . . . drive past the home on the same date[.]"  Plaintiff alleged the friend "trespassed onto [his] property in an attempt to take pictures of his friend's vehicle."  Plaintiff also alleged defendant previously had driven to his residence on November 18, 2023, parked in the driveway and asked him "what his friend's vehicle was doing in the driveway of [the] residence."

On January 26, plaintiff filed an amended complaint to incorporate terms of a consent order entered in the parties' pending divorce matter.  The amended TRO specified that plaintiff would maintain exclusive use of the residence located in Cranford and defendant would maintain exclusive use of the residence

---

[3]  Although the "Stalking" box was not checked on the plaintiff's complaint, at pre-trial arguments, the court determined the factual assertions of the complaint sounded in stalking, N.J.S.A. 2C:12-10.

located in Mantoloking beginning on February 2. On February 6, plaintiff filed a second amended complaint, including the prior history of domestic violence.

In the second amended complaint, under the section entitled "prior history," plaintiff asserted in September, 2023 defendant "verbally harassed [him], spat in his face and attempted to barricade him into a room in the basement . . ." He further asserted in "June and/or July 2023, defendant placed tracking devices on [his] vehicles" and "since he became aware of the [] devices and removed them, defendant has continued to surveil his location by driving by his home on multiple occasions."

An FRO hearing was conducted before the trial court over two non-consecutive days in March, 2024. At the hearing, plaintiff testified he found a tracking device on his vehicle in August 2023. He discovered the tracking device after he received a phone notification of movement outside of the Cranford house and he observed defendant near the side of his vehicle. Plaintiff testified he reviewed the video application and "thought [it] was odd" defendant was standing near his work vehicle. Later that morning, plaintiff inspected his vehicle and discovered a tracking device was attached underneath. Plaintiff removed the device and confronted defendant, who denied placing the device on his vehicle.

4

Plaintiff testified three weeks after he found the first tracking device, he discovered a second tracking device attached to his vehicle, which he also removed. Subsequently, plaintiff checked his other vehicle that was parked in the garage and discovered a third tracking device. Plaintiff testified he believed the defendant had been tracking him since June or July, 2023, based on her submissions in the divorce action which had pinpointed his exact locations.

Plaintiff also testified that on September 8, while he was washing clothes in the basement of the Cranford residence, he was confronted by defendant concerning their marital issues. Plaintiff stated when he told defendant that he wanted a divorce, she spat in his face. He stated when he informed defendant he was going to call 911, defendant smacked his phone out of his hand and hit him with a broomstick, injuring his hand. Plaintiff testified he then walked into another room in the basement but defendant followed him and used the broomstick to attempt to lock him in the room. Plaintiff stated that despite defendant's efforts to barricade the door, he was able to open it and exit the room. Plaintiff testified the following day he went to the Cranford Police Department, reported the incident, and showed police his injured hand caused by defendant striking him with the broomstick. Plaintiff testified that he reported the incident because he "was afraid" of defendant.

5

Plaintiff further testified that on November 18, defendant drove by the Mantoloking property twice, pulled in the driveway, and photographed a vehicle parked there. Plaintiff testified between November 2023 and the date of the TRO in January 2024, he observed defendant driving by the Mantoloking home ten to twelve other times, and he saw other vehicles driving by and stopping to take photos.

Plaintiff also stated that on January 14, 2024, two days after the divorce hearing, he woke up from a cell phone notification that there was activity in front of his house. Plaintiff reviewed the videos and observed defendant driving by his home four times between 5:57 a.m. and 6:49 a.m. On the last drive by, defendant stopped in front of the home to take pictures. Plaintiff testified he "felt violated" and "concerned" after seeing defendant driving by and taking photos.

Plaintiff relayed later the same evening while watching television with a friend, he received an alert on his phone that a person was in his driveway. Plaintiff viewed the phone application video and saw a person walking down his driveway. Plaintiff stated because he was concerned for his safety and the safety of his guest, he went outside and confronted the man in his driveway. He stated the man then fled in his vehicle. Plaintiff testified he got into his own vehicle,

6

following the man while calling the police, and the police apprehended the man. Plaintiff recognized the man as defendant's friend. Thereafter, plaintiff went to the Brick Police Department and filed a complaint under the PDVA and obtained the TRO against defendant.

Defendant did not testify at the hearing. After the hearing concluded, the trial court issued a decision granting plaintiff an FRO. The court found plaintiff had proven defendant had committed the predicate act of harassment pursuant to N.J.S.A. 2C:33-4(c) and that he needed an FRO to protect him from further domestic violence. The court also found that plaintiff failed to prove the predicate act of stalking under N.J.S.A. 2C: 12-10.

The court noted "there was only one witness who testified in this case and that was [plaintiff]." Concerning plaintiff's credibility, the court considered "several factors," including

> the witness' interest if any in the outcome of the case, the accuracy of the witness' recollection, the witness' ability to know what he or she is talking about, the reasonableness of the testimony, the witness' demeanor on the stand, the witness' candor or evasion, the witness' willingness or reluctance to answer, the inherent believability of the and the presence of any inconsistent or contradictory statements.

Immediately after providing its credibility considerations, the court expressly stated "I decline to take a negative inference against the defendant"

because of her failure to testify. The court also mentioned a pending criminal action against defendant as her reason for possibly choosing not to testify. The court recited the standards set forth in the harassment statute at N.J.S.A. 2C:33-4 and found subsections (a) and (b) did not apply. However, the court found that subsection (c) applied to the facts adduced at the hearing. The court cited to State v. Hoffman, 149 N.J. 564 (1997) for the proposition that subsection (c) requires "a course of alarming conduct or repeated acts with the purpose to alarm or seriously annoy an intended victim." The court found Hoffman also "held that serious annoyance means to weary, to worry, trouble or offend."

The court analyzed whether a predicate act of domestic violence had occurred and determined plaintiff's testimony was credible that "on January 14th of 2024 . . . the defendant drove by his residence four times on that date between the hours of 5:57 in the morning to 6:49 in the morning . . ." The court also relied on "the screen grabs of the vehicle driving back and forth," which had been moved into evidence at the hearing.

The court further found "later on in the day an individual also came to the home, trespassed . . . on the victim's property and attempted to take pictures of a vehicle [that] belonged to either a friend or a girlfriend of [plaintiff]." The court determined "that taken in conjunction with the fact that the defendant had

driven by the home four times earlier in the day, certainly lends this [c]ourt to a determination that in fact there was a form of harassment on that date." The court then found "defendant engaged in a course of alarming conduct or repeatedly committed acts with purpose to alarm or seriously annoy such other person" based on these actions.

The trial court also stated,

> [I]f it had just been the defendant driving by four times, I don't know. But the fact that there was somebody else who was known to the defendant, who later showed up at the property certainly in this [c]ourt's mind gives rise to the fact that it was the defendant's purpose to harass the plaintiff and that he was harassed [based on] his testimony that [this] occurr[ed].

The court also found "on November 18th of 2023 [] defendant had also driven to his residence and parked in the driveway." The court also noted that it was clear that the parties "understood that at that time [plaintiff] had [exclusive possession of] the Mantoloking property and [defendant] had [exclusive possession of] the Cranford property" and the parties were "living separate and apart."

Additionally, the court analyzed plaintiff's credibility and whether an FRO was warranted under Silver, when it found:

> [Plaintiff] maintained himself . . . [and] did not in any way alter his testimony . . . I find he was very candid in

regard to what he testified about what occurred on September 8th of 2023. And I find that he testified truthfully in regard to that prior incident where there was [] physicality displayed by the defendant to the plaintiff in conjunction with the tracking devices that were placed on the plaintiff's car. There is absolutely no reason for the defendant to be continually going to the plaintiff's residence whether or not she wanted to gather evidence of cohabitation or not. There are other means she could have employed in order to do that, by way of a private investigator, anything else other than continually driving by four times on January 14th, going there on November 18th, placing the tracking devices on the plaintiff's car.

The court concluded by finding defendant "did commit acts of domestic violence that constituted harassment" and that under the second prong of <u>Silver</u> that a restraining order is necessary to "protect [plaintiff] from future acts of domestic violence."

On appeal, defendant argues the trial court erred by issuing the FRO because the underlying acts did not constitute domestic violence under the stated purpose of the PDVA. Defendant contends her actions—driving by the shared home in November 2023 and January 2024—was not harassment. Relying on our decision in <u>Corrente v. Corrente</u>, 281 N.J. Super. 243 (App. Div. 1995), defendant asserts there was no communication with plaintiff, and her purpose was simply to gather cohabitation evidence for their divorce, in order to defend against plaintiff's alimony claims.

A-2737-23

She asserts the trial court erroneously concluded that her actions of driving by the Mantoloking property were "alarming" conduct, as defendant's intent was not to harass but to verify her suspicions regarding plaintiff's cohabitation. Defendant notes the trial court's failure to consider the context of divorce proceedings and its misapplication of the harassment statute trivialized the PDVA's intent. Defendant further contends plaintiff's claim of feeling "violated" was based on his own subjective feelings and self-serving statements. Thus, defendant contends her conduct was simply fact-gathering and did not rise to the level of harassment under the PDVA.

Defendant also contends there was no evidence of prior communication or offensive physical contact, and defendant actively avoided contact with plaintiff. Defendant states that even plaintiff's own statements regarding his feelings about defendant's visits do not meet the statutory elements for harassment under the PDVA. Therefore, the trial court's findings failed to establish that defendant had the purpose to harass, alarm, or seriously annoy, and therefore, the FRO should be reversed and vacated.

Defendant also asserts that even if her actions qualified as a predicate act of harassment, plaintiff failed to sustain his burden under the second prong of

11

Silver because he failed to provide sufficient proofs that an FRO was necessary to protect him from immediate danger or further acts of domestic violence.

Defendant further posits the court's finding that defendant should have hired a private investigator to obtain evidence of cohabitation rather than investigating this issue herself was error. Defendant cites the cohabitation statute at N.J.S.A. 2A:34-23(n) and asserts the elements of cohabitation can be proven through a direct investigation by a party. Defendant asserts the court's "requirement [to hire a private investigator] infringes on a parties right to gather evidence required to establish a prima facie case as clarified by [Cardali v. Cardali, 255 N.J. 85, 108 (2023)] . . . amounting to a violation of due process." Citing to Moynihan v. Moynihan, 250 N.J. 60 (2021), defendant asserts our Supreme Court found that "a legislative requirement" for parties to engage attorneys to enter into a "palimony" agreement was a "due process" violation. Similarly, she contends the same due process analysis should apply to the court's decision requiring defendant to engage a private investigator to investigate cohabitation claims.

Defendant's last point on appeal asserts the court erred by "drawing a negative inference against [defendant] by accepting [plaintiff's] testimony as fact." Defendant asserts although the court found it was not drawing a negative

inference based on defendant's failure to testify that, "in fact, [it did] take that inference by erroneously accepting everything [plaintiff] said was believable, without considering alternative innocent reasons for [defendant's] actions."

II.

The scope of appellate review of a Family Part court's findings following a bench trial is limited. N.T.B. v. D.D.B., 442 N.J. Super. 205, 215 (App. Div. 2015) (citing Cesare v. Cesare, 154 N.J. 394, 411 (1998)). We owe substantial deference to the Family Part's findings of fact because of its special expertise in family matters. Cesare, 154 N.J. at 413 (citations omitted). Such deference is particularly proper "when the evidence is largely testimonial and involves questions of credibility." Id. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)).

We will not disturb a trial court's factual findings unless "they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). However, we do not accord such deference to legal conclusions and review such conclusions de novo. Thieme v. Aucoin-Thieme, 227 N.J. 269, 283 (2016).

The PDVA authorizes an FRO to be issued if two criteria are met. Silver, 387 N.J. Super. at 125. The plaintiff seeking the FRO must prove that (1) "one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred," and (2) that the order is necessary to protect plaintiff "from an immediate danger or to prevent further abuse." Id. at 125, 127.

Harassment is one such predicate act. N.J.S.A. 2C:25-19(a)(13). Harassment is defined in N.J.S.A. 2C:33-4, which provides in pertinent part: A person commits harassment under N.J.S.A. 2C:33-4(c), if he or she engages "in any course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person."

"A finding of a purpose to harass may be inferred from the evidence." Hoffman, 149 N.J. at 577 (citing State v. McDougald, 120 N.J. 523, 566-67 (1990); State v. Avena, 281 N.J. Super. 327, 340 (App. Div. 1995)). "Common sense and experience may inform that determination." Ibid. (citing State v. Richards, 155 N.J. Super. 106, 118 (App. Div. 1978)).

"A complaint charging harassment in the domestic violence context also requires an evaluation of the plaintiff's circumstances." Cesare, 154 N.J. at 404 (citing Hoffman, 149 N.J. at 584-85). "Although a court is not obligated to find a past history of abuse before determining that an act of domestic violence has

14

been committed in a particular situation, a court must at least consider that factor in the course of its analysis." Id. at 402. Prior acts . . . are to be considered in assessing the defendant's purpose. See McGowan v. O'Rourke, 391 N.J. Super. (App. Div. 2007).

III.

Initially, we address defendant's argument that the underlying allegations did not constitute domestic violence in accordance with the legislative intent of the PDVA because her purpose was to gather information about plaintiff's cohabitation, not to harass plaintiff. We determine this argument lacks merit because plaintiff's allegations of harassment were not exclusively based on defendant driving by plaintiff's residence four times on January 14, 2024. Plaintiff testified that between November 2023 and the date of the TRO in January 2024, defendant had previously driven by ten to twelve other times and had observed other vehicles driving by and stopping to take photographs.

The court also considered this evidence in conjunction with plaintiff's testimony of the history of domestic violence. Those previous acts included defendant's placement of trackers on plaintiff's vehicles, defendant's assault of plaintiff in September 2023, and defendant's authorizing third parties to enter onto the Mantoloking property to take investigative photographs.

15

Our Supreme Court has explained:

> The fears of a domestic violence victim and the turmoil she or he has experienced should not be trivialized. In different contexts, a recipient . . . may not be alarmed or seriously annoyed, but some victims of domestic violence may rightly view a course of communicative conduct as seriously annoying, alarming, or threatening, or all of those things.
>
> [Hoffman,149 N.J. at 586.]

We reiterate that a finding of a purpose to harass may be inferred from the evidence and the court must use its common sense and experience when making this determination, including an evaluation of the plaintiff's circumstances. Here, the court found plaintiff's unopposed testimony to be credible. We conclude the court did not misapply its discretion by finding plaintiff's testimony—which described the incidents of harassment clearly and in sufficient detail—as credible. Plaintiff's testimony distinctly described (1) the alleged predicate acts based on defendant driving by the residence several times on January 14, 2024, and multiple times previous to this date to take photographs; and (2) authorizing her friend to trespass on the property to take photographs later on the same date. In addition, plaintiff's testimony also provided a detailed description of several prior incidents of harassment by defendant including (1) the surreptitious placement of tracking devices on his

16

vehicles; and (2) the incident in September 2023 where defendant assaulted plaintiff by spitting in his face, hitting his hand with a broomstick, and attempting to lock him in a room by placing the broomstick across the door.

We conclude there was sufficient evidence in the record for the court to reasonably infer that defendant placed trackers on plaintiff's vehicles and authorized her friend to enter onto the property where plaintiff exclusively resided to take photographs  Our cases approve of findings supported by circumstantial evidence and inferences.  "[R]ules of ordinary reasoning" govern the worth of circumstantial evidence, and the question of inferences that may be drawn is "one of logic and common sense."  See State v. Samuels, 189 N.J. 236, 246 (2007).  We further conclude plaintiff's direct testimony clearly supported the court's finding that defendant had spit on and physically attacked plaintiff with a broomstick in September 2023.

We are unpersuaded by defendant's contention that her purpose was to investigate claims of cohabitation, not to harass.  The trial court's rejection of that contention and its finding that defendant's purpose was to harass plaintiff is sufficiently supported by the record.  The trial court heard this defense and determined defendant's purpose—for driving by plaintiff's residence multiple times to take photographs—was to harass him.  The court also found defendant's

17

authorization for a third party to enter onto the plaintiff's property to take photographs also had the purpose to harass. Under these circumstances, we discern no error with the court's determination that defendant authorizing a third party to enter onto the property to take photographs, knowing plaintiff was exclusively residing there, was inappropriate, violative of plaintiff's right to privacy, and had the purpose to harass plaintiff. We conclude sufficient, credible evidence existed in the record to support the court's findings, including the parties separation and agreement for plaintiff to live in the Mantoloking house at the time of the incidents forming the basis of his complaint.

We now address defendant's contention that the plaintiff's proofs were insufficient to satisfy the second prong of Silver. We find no merit to this argument. The court's detailed findings of the prior history of domestic violence—which we addressed previously and shall not repeat for the sake of conciseness—clearly support that an FRO was necessary to protect plaintiff from future harassment.

Turning to defendant's final argument asserting the trial court drew a negative inference against defendant by "accepting plaintiff's testimony as fact," we conclude this argument is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). We add only the following comments. The

record is clear that the trial court made a definitive finding that it did not take a negative inference against defendant because of her failure to testify at the hearing. We observed nothing in the court's cogent decision that showed otherwise.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division